
EXHIBIT A

Electronically Filed - St Louis County - January 25, 2022 - 11:13 AM

**EXHIBIT**

**A**

## IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
## STATE OF MISSOURI

| | | |
|---|---|---|
| **NIKKI STEINER MAZZOCCHIO,** | ) | |
| **and ANGELA STEINER KRAUS,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. _____ |
| | ) | |
| **COTTER CORPORATION,** | ) | |
| **Serve at:** | ) | **JURY TRIAL DEMANDED** |
|     C T Corporation System | ) | |
|     Registered Agent for | ) | |
|     Cotter Corporation | ) | |
|     7700 E. Arapahoe Road, | ) | |
|     Suite 220 | ) | |
|     Centennial, CO 80112 | ) | |
| | ) | |
| **COMMONWEALTH EDISON** | ) | |
| **COMPANY,** | ) | |
| **Serve at:** | ) | |
|     Corporate Creations | ) | |
|     Network Inc. | ) | |
|     Registered Agent for | ) | |
|     Commonwealth Edison | ) | |
|     Company | ) | |
|     350 S. Northwest Highway, | ) | |
|     Suite 300 | ) | |
|     Park Ridge, IL 60068 | ) | |
| | ) | |
| **DJR HOLDINGS, INC.** | ) | |
| **f/k/a FUTURA COATINGS, INC.,** | ) | |
| **Serve:** | ) | |
|     Rodney D. Jarboe | ) | |
|     9200 Latty Avenue | ) | |
|     Hazelwood, MO 63042 | ) | |
| | ) | |
|     **and** | ) | |
| | ) | |
| **ST. LOUIS AIRPORT** | ) | |
| **AUTHORITY, A DEPARTMENT** | ) | |
| **OF THE CITY OF ST. LOUIS** | ) | |
| **Serve:** | ) | |

Mayor Tishaura Jones       )
St. Louis City Hall         )
1200 Market St           )
Room 200              )
St. Louis, MO 63103      )
                                )
**Defendants.**            )
                                )

## PETITION

COMES NOW Plaintiffs, by and through their undersigned counsel, and for their claims and causes of action against Defendants Cotter Corporation, Commonwealth Edison, DJR Holdings, and the St. Louis Airport Authority, and state the following based on personal knowledge as to their own acts and on information and belief as to all other allegations:

## INTRODUCTION

1.     Plaintiffs bring this action against Defendants seeking redress for bodily injury suffered by Plaintiffs as a result of Defendants' acts and omissions, including their negligent acts and omissions, related to the processing, transport, storage, handling, and disposal of hazardous, toxic, and radioactive materials in close proximity to residential neighborhoods in and around St. Louis County, Missouri.

2.     Since World War II, big companies have made significant profits processing, handling, and storing radioactive materials in the St. Louis area. This activity began six decades ago, when Mallinckrodt received in downtown St. Louis City special highly concentrated uranium with high levels of radium from Africa. This special ore was extremely toxic—more so than the ores available from anywhere else

in the world. Despite the fact that these materials were some of the most harmful on Earth, Defendants moved them around St. Louis, treating the radioactive materials with less care than a reasonable person might give in moving common household garbage. Vast amounts of radioactive wastes were moved from downtown St. Louis to the St. Louis Airport, then to Hazelwood.

3. Until the 1970s, radioactive materials were stored in bulk, on the ground, open to the elements, and unattended at sites on and adjacent to Coldwater Creek, which runs throughout North St. Louis County and is a tributary for the Missouri River. These sites included the St. Louis Airport Site ("SLAPS"), a storage facility on Latty Avenue is Hazelwood, Missouri (the "Latty Avenue Site") (part of which later became the Hazelwood Interim Storage Site ("HISS").

4. Since then, that radioactive material, negligently dumped in an area surrounded by peaceful neighborhoods and playgrounds, has tormented the lives of everyday people—moms and dads who thought they were raising their kids in a clean home in a safe, quiet neighborhood; kids who want nothing more than to play in the backyard; and small business owners who had invested everything to build the American dream for their families. These everyday St. Louisans now find their lives disrupted, their kids sick, their homes contaminated, their businesses upended, and their properties worthless. They find their once-quaint neighborhoods filled with technicians testing and prodding their backyards and the dust of their vacuum cleaners to identify the quantity and the toxicity of the radioactive material Defendants have dumped into their lives.

5.     Tests conducted by representatives of the United States of America and others now confirm that the areas around Coldwater Creek are contaminated with the same radioactive wastes generated in the processing of uranium ores in the St. Louis area.  The off-site radioactive waste found today in the real property, which contains businesses and homes, surrounding the Coldwater Creek has the fingerprint (or profile) of the ore processed in St. Louis by Defendants.

6.     These radioactive wastes are known human carcinogens that can cause chronic damage to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system in addition to numerous cancers. Illnesses such as cancers or birth defects may take a number of years after exposure to the radioactive material to appear.

7.     Plaintiff Nikki Steiner Mazzocchio (hereinafter "Mazzocchio") lived in an apartment in Hazelwood, Missouri from 1984 until 1986. The apartment that Plaintiff Mazzocchio lived in abutted Coldwater Creek. Mazzocchio's apartment flooded with water from Coldwater Creek during the time that she lived in the apartment.

8.     Plaintiff Angela Steiner Kraus (hereinafter "Kraus") lived in an apartment in Hazelwood, Missouri from 1997 until 2002. The apartment that Plaintiff Kraus lived in abutted Coldwater Creek. Kraus apartment flooded with water from Coldwater Creek during the time that she lived in the apartment

**JURISDICTION AND VENUE**

9.     This court has jurisdiction over the subject matter and the parties in this case because the causes of action stated in this Petition arose out of business activities conducted solely in Missouri  and out of torts committed solely in Missouri by resident and non-resident defendants.

10.     Venue is proper in this court pursuant to Mo. Rev. Stat. §508.010, because Defendants' conduct giving rise to this action took place in St. Louis County, Missouri.

11.     Plaintiffs do not allege any causes of actions arising under any laws of the United States.

12.     Plaintiffs' claims do not fall within the scope of the Price Anderson Act.

13.     Coldwater Creek is not and has never been a licensed nuclear facility.

14.     Defendants have never received a license to possess, transport, or dispose of any radioactive wastes on or in Coldwater Creek.

15.     Defendants did not have a license to dispose of radioactive wastes in Coldwater Creek.

16.     Defendants did not have a license to handle the particular materials they handled as alleged herein, including enriched thorium.

17.     Defendants have never entered into an indemnification agreement with the United States government under 42 U.S.C. § 2210 with respect to the complained activities.

18.     Plaintiffs expressly contend that no occurrences that form the basis for this suit rise to the level of a nuclear incident. Plaintiffs' claims are freestanding state

law claims concerning traditional state regulation and do not implicate the Price-Anderson Act and its textually manifest concerns related to liability limitation and indemnification.

19. At the time of the outrageous, reckless, negligent acts that form the basis for this lawsuit occurred, the Price Anderson Act did not apply because the wastes at issue were not subject to said Act.

20. The Price-Anderson Act does not apply to the indisputably hazardous, toxic and carcinogenic wastes at issue in this Petition.

## PARTIES

21. The following people are the Plaintiffs in this action:

A.1. Nikki Steiner Mazzocchio lived in the French Quarter apartments, at 7371C Normandie Ct., in Hazelwood, Missouri, directly abutting Coldwater Creek from approximately 1984 until 1986. During those times, Ms. Mazzocchio's apartment would flood with waters from the nearby Coldwater Creek. In March of 2018, Ms. Mazzocchio was diagnosed with multiple myeloma. As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous and radioactive substances into the area surrounding her homes, Ms. Mazzocchio developed significant and debilitating personal injuries. As a result of Defendants' reckless, negligent, and grossly negligent conduct, Ms. Mazzocchio suffered severe physical injury, pain, and suffering, and has incurred medical expenses, and will continue to incur medical expenses for treatment in the future.

A.2. Angela Steiner Kraus lived in the French Quarter apartments, at 7360F Normandie Ct., in Hazelwood, Missouri, directly abutting Coldwater Creek from approximately 1997 until 2002. During those times, Ms. Kraus's apartment would flood with waters from the nearby Coldwater Creek. Ms. Kraus also maintained an outdoor garden at the apartment with herbs and tomatoes which she and her sister would eat. In May of 2018, Ms. Kraus was diagnosed with multiple myeloma. As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous and radioactive substances into the area surrounding her homes, Ms. Kraus developed significant and debilitating personal injuries. As a result of Defendants' reckless, negligent, and grossly negligent conduct, Ms. Kraus suffered severe physical injury, pain, and suffering, and has incurred medical expenses, and will continue to incur medical expenses for treatment in the future.

A3. Plaintiffs Ms. Mazzocchio and Ms. Kraus are sisters. They were born 8 years apart from one another, but yet their cancer diagnoses occurred within 5 weeks of one another.

22.     The following parties are Defendants in this action:

B.1. Cotter Corporation ("Cotter") is a Colorado corporation with its principal place of business in Englewood, Colorado, which operates as a subsidiary of General Atomics, Inc., a California corporation. It was purchased by and became a wholly owned subsidiary of Commonwealth Edison in 1975. Cotter continuously and systematically carries on business activities in the State of Missouri in its own name,

Electronically Filed - St Louis County - January 25, 2022 - 11:13 AM

through its parent companies ComEd and Exelon, as well as through its subsidiary General Atomics, Inc. This lawsuit arises out of damages that resulted from the Cotter Defendants' conduct including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the Cotter Defendants, which gave rise to the personal injuries alleged in the Petition.

B.2. Commonwealth Edison Company ("ComEd") is an Illinois corporation, whose former subsidiary corporation, Cotter, conducted business operations in Missouri. Upon the sale of Cotter, ComEd agreed to indemnify Cotter for certain liabilities associated with these activities. ComEd continuously and systematically carries on business activities in the State of Missouri, both on its own and through its subsidiaries including Cotter and its parent company Exelon. In addition, ComEd owned Cotter at times relevant to this Petition, and agreed to indemnify Cotter for liabilities associated with the creation, storage, transportation, and processing of hazardous, toxic, carcinogenic, radioactive wastes as alleged herein. ComEd regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried here. This lawsuit arises out of damages that resulted from the ComEd Defendants' conduct including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the ComEd Defendants, which gave rise to the personal injuries alleged in the Petition.

B.3. DJR Holdings, Inc., formerly known as Futura Coatings, Inc. ("Futura Coatings") is a Missouri corporation with its principal place of business in Missouri.

B.4. The St. Louis Airport Authority, which is a department of the City of St. Louis, is now and was at all times herein mentioned a public entity organized and existing pursuant to Article 6, Section 31 of the Missouri Constitution.

## BACKGROUND

23.     During World War II, the nation began a top-secret project to build the first atomic bomb. At this time, the Army created the Manhattan Engineering District ("MED") to carry out much of the work of the so-called "Manhattan Project." After the war, the nation sought ways to use nuclear energy for peaceful purposes and formed the Atomic Energy Commission ("AEC") in 1946 to continue this nuclear research. Some of this work was performed in the St. Louis area.

24.     From 1942 to 1957, under contracts with the MED and/or the AEC, the Destrehan Street Refinery and Metal Plant (which later became Mallinckrodt Chemical Works) processed natural uranium into uranium oxide, trioxide, and metal uranium at a facility in downtown St. Louis, Missouri. This facility became known as the St. Louis Downtown Site ("SLDS"). The SLDS site became contaminated with hazardous, toxic, and radioactive substances as a result.

25.     In 1946, MED acquired the St. Louis Airport Site ("SLAPS"), a 21-acre site just north of the St. Louis Airport, for storage of hazardous, toxic, and radioactive waste residues from the SLDS. In subsequent years, the SLAPS and adjacent properties became contaminated with hazardous, toxic, and radioactive substances as a result.

26. During the 1960's, private companies purchased the hazardous, toxic and radioactive waste residues being stored at the SLAPS and began hauling them from the SLAPS to a site on Latty Avenue in Berkeley, Missouri (part of this site later became the Hazelwood Interim Storage Site ("HISS")). These waste residues, which contained valuable metals, were sold for their commercial value and shipped to various other destinations. The Latty Avenue site became contaminated with hazardous, toxic, and radioactive substances as a result.

27. Transport and migration of hazardous, toxic, and radioactive waste residues to/from the SLDS, the SLAPS and the HISS also spread hazardous, toxic, and radioactive substances along haul routes to nearby Vicinity Properties ("VPs"). Even though the federal government was not responsible for this contamination, Congress directed that the government add these sites to the Formerly Utilized Sites Remedial Action Program ("FUSRAP").[1]

### THE ST. LOUIS FUSRAP SITES[2]

28. Between 1942 and 1973, Defendants processed, stored, handled, and/or disposed of large volumes of hazardous, toxic, and radioactive materials in four separate geographical areas located in and around metropolitan St. Louis, Missouri.

---

[1] The Formerly Utilized Sites Remedial Action Program (FUSRAP) is an environmental remediation program that addresses radiological contamination generated by activities of the Manhattan Engineer District and the Atomic Energy Commission ("MED/AEC") during development of the atomic weapons in the 1940s and 50s.

[2] The St. Louis FUSRAP Sites include: (1) the St. Louis Downtown Site ("SLDS"); (2) the St. Louis Airport Site ("SLAPS"); (3) the Hazelwood Interim Storage Site ("HISS"); (4) the Vicinity Properties ("VPs"); and (5) the Madison Site.

The designations assigned to these sites are the St. Louis Downtown Site, the North St. Louis County Sites, the Madison Site, and the West Lake Landfill Site.

### The St. Louis Downtown Site ("SLDS")

29.     The St. Louis Downtown Site is located in an industrial area on the eastern border of St. Louis, approximately 300 feet west of the Mississippi River. The property is about 11 miles southeast of the SLAPS and the Lambert-St. Louis International Airport. The SLDS encompasses nearly 45 acres and is presently owned and operated by Mallinckrodt, Inc. (formerly Mallinckrodt Chemical Works). The property includes many buildings and other facilities involved in chemical production.

30.     From 1942 to 1957, Mallinckrodt used the SLDS for processing various forms of uranium compounds, for machining, and for recovery of uranium metal. In 1946, Mallinckrodt began the manufacture of uranium dioxide from pitchblende ore at a newly constructed plant at the SLDS.

31.     When Mallinckrodt ran out of space at the SLDS to store the hazardous, toxic and radioactive waste residues left over from the production process, a 21.7-acre tract of land (now known as the SLAPS) was procured in north St. Louis County to store hazardous, toxic and radioactive waste residues from uranium processing at the SLDS.

### The North St. Louis County Sites:[3]

---

[3] The North St. Louis County Sites consist of: (1) the St. Louis Airport Site; (2) the SLAPS Vicinity Properties (VPs); and (3) the Latty Avenue Properties.  In October 1989, EPA placed three of the North St. Louis County site properties (SLAPS, HISS, and Futura Coatings Company) on the Superfund National Priorities List ("NPL").

32.     The St. Louis Airport Site is an unincorporated 21.7-acre property located near the St. Louis Airport in north St. Louis County. The SLAPS is bounded by McDonnell Boulevard to the north, Banshee Road and Norfolk Southern Railroad on the south, and Coldwater Creek on the west.

33.     Mallinckrodt used the SLAPS to store hazardous, toxic and radioactive waste residues generated by Mallinckrodt during uranium processing activities at the SLDS. These materials included, but were not limited to, pitchblende raffinate residues, radium-bearing residues, barium sulfate cake, Colorado raffinate residues and contaminated scrap.

34.     Mallinckrodt stored the radioactive materials in bulk on the open ground or buried at the western end (near Coldwater Creek) and at other parts of the SLAPS.

35.     By 1960, there were approximately 50,000 empty drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS.

36.     The SLAPS Vicinity Properties ("VPs") consist of approximately 78 properties, including properties along former haul routes between the SLAPS and the HISS, Coldwater Creek, the open fields (a former ball field area) immediately north of the SLAPS, and other SLAPS contiguous properties. The SLAPS VPs impacted by hazardous, toxic, and radioactive wastes are located along the haul routes between the SLAPS and the HISS, and include both recreational and residential properties.

These haul routes include Eva Avenue, Frost Avenue, Hazelwood Avenue, McDonnell Boulevard, and Pershall Road.

37.     Coldwater Creek flows for 500 feet [153 meters] along the western border of the SLAPS. The creek originates 3.6 miles [5.8 kilometers] to the south of the SLAPS and continues for 15 miles [24 kilometers] in a northeasterly direction through the City of Hazelwood, the City of Florissant, unincorporated areas of St. Louis County, and along the northern edge of the community of Black Jack, until it discharges into the Missouri River. Coldwater Creek is generally accessible to the public, except for approximately 1.2 miles [1.9 kilometers], which flows under the Lambert-St. Louis International Airport. Coldwater Creek is contaminated with hazardous, toxic, and radioactive materials.

38.     The Latty Avenue Properties are located in an area approximately one half mile [1 kilometer] north of the St. Louis Airport in the towns of Hazelwood and Berkeley, Missouri. The Properties include: (1) the Hazelwood Interim Storage Site; (2) the Futura Coatings Site (used for manufacturing plastic coatings); and (3) several Vicinity Properties on Latty Avenue. The Latty Avenue Properties have elevated levels of residual uranium and thorium on site.

39.     From approximately 1961 to 1990, hazardous, toxic, and radioactive materials, specifically those involved in the processing of columbium and tantalum (C-T), were used in activities for commercial clients at the SLDS. The contamination present in the soil and groundwater at the FUSRAP sites may be attributed to

releases of radionuclides to the environment during the uranium processing operations, the C-T processing operations, or operations unique to the VPs.

40.    Hundreds of thousands of tons of hazardous, toxic, and radioactive wastes were transported from the SLDS to the SLAPS for storage, including radium-bearing residues, refined cake, barium sulfate cake, and C-liner slag. Over time, these hazardous, toxic, and radioactive waste residues migrated directly from the SLAPS onto other sites (via Coldwater Creek) or were deposited as the residues were hauled along transportation routes, contaminating the soils and sediments of the Vicinity Properties.

41.    The SLDS and the North St. Louis County Sites have elevated levels of uranium, thorium, and radium in soils and groundwater. The EPA has concluded that direct contact with, or accidental ingestion of, contaminated soils or groundwater near these sites may pose health risks to individuals.

## SITE HISTORY

42.    Mallinckrodt processed uranium feed material for the production of uranium metal from 1942 to 1957 under contracts with the Manhattan Engineer District and the Atomic Energy Commission ("MED" / "AEC"). The work was performed at the Mallinckrodt Plant, located at the SLDS. Within a year, the SLDS ran out of space to store the hazardous, toxic, and radioactive waste residues left over from the production process.

43.    Beginning in 1946, the hazardous, toxic, and radioactive waste residues left over from the production process at the SLDS were being transported to the

SLAPS for storage.[4] Scrap metal, chemical drums, and other contaminated debris were placed in low areas at the SLAPS adjacent to Coldwater Creek on the western end of the property and covered with dirt to make a level storage area.

44.     By 1960, there were approximately 50,000 chemical drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS directly adjacent to Coldwater Creek. Coldwater Creek is the major drainage mechanism for the SLAPS, the SLAPS VPs, and the Latty Avenue Properties. It has been designated a Metropolitan No- Discharge Stream. Through time, various meanders in Coldwater Creek were backfilled to support construction, resulting in commingling of the site soils and sediments with hazardous, toxic, and radioactive wastes brought to the SLAPS.

45.     These hazardous, toxic, and radioactive wastes residues were removed from the SLAPS in various stages throughout the 1960s. Initially, the residues were sold to Contemporary Metals Corporation ("Contemporary Metals").  Soon thereafter, their subsidiary, Continental Mining & Milling Company ("CMM"), began transporting the waste residues to property at 9200 Latty Avenue (now known as the HISS and the Futura Coatings Company properties) for storage.

46.     After CMM went into receivership, the Commercial Discount Corporation ("CDC") of Chicago, Illinois, took possession of its assets, including the

---

[4] The following byproducts and scrap were transported mainly from the SLDS to the SLAPS for storage: padium- bearing residues ("K-65" residues); AM-7 pitchblende raffinate cake; AM-10 Colorado raffinate cake; AJ-4 barium sulfate cake (unleached) and AJ-4 barium cake (leached); C-liner slag that was created during metal firming operations; C-701 U scalping of magnesium fluoride, Japanese precipitates, Vitro residues from the Vitro Corporation's facility in Canonsburg, PA; and empty drums, contaminated steel and alloy scrap, and building debris.

Latty Avenue Property and the hazardous, toxic, and radioactive waste residues stored therein.

47.     In 1969, the remaining hazardous, toxic, and radioactive wastes residues at Latty Avenue were sold to the Cotter Corporation ("Cotter") of Canon City, Colorado. In 1970, Cotter employed B&K Construction Company of St. Louis, Missouri, to transport these waste residues out of state. By late 1970, most of the residues had shipped offsite, except for 10,000 tons of Colorado raffinate and 8,700 tons of leached barium sulphate raffinates.

48.     In 1973, Cotter disposed of approximately 47,700 tons of soil mixed with uranium ore processing residues, including leached barium sulfate, uranium, and thorium, into the West Lake Landfill. This radiologically contaminated soil was routinely used as cover for municipal wastes and other landfill operations.

49.     Since 1946, residues have migrated from the SLAPS (via runoff onto adjacent properties and Coldwater Creek or wind) or were released or otherwise deposited when material was transported along haul routes, contaminating the soil and sediments at the SLAPS VPs and the Latty Avenue Properties.

50.     During the relocation of waste material, improper handling and transportation from the SLAPS to the Latty Avenue Sites, caused contamination to spread along haul routes. Improper storage exacerbated the contamination and caused adjacent properties (the SLAPS and the Latty Avenue Vicinity Properties (VPs)) to be contaminated.

## INVESTIGATION OF CONTAMINATION

51.     In October 1989, Congress added the SLAPS, the HISS and the Futura Site to the U.S. EPA's NPL.

52.     In 1992, the Madison Site was added to the FUSRAP list slated for cleanup. Approximately two cubic yards of contaminated uranium and thorium dust were located on overhead surfaces. Forty cubic yards of contaminated dust and materials had to be sent offsite for disposal.

53.     In 1994, the Department of Energy ("DOE") issued a Remedial Investigation ("RI") Report summarizing the results of previous investigations conducted at the North St. Louis County Sites and SLDS. The RI Report concluded that contamination is present in both surface and subsurface soils at the North St. Louis County Sites.

54.     In 1995, DOE issued an RI Addendum Report to summarize the results of an additional investigation conducted to fill the data gaps identified in the RI Report. The activities associated with this investigation included, but were not limited to, soil sampling at the SLAPS VPs; sediment sampling in Coldwater Creek; installation of monitoring wells at the SLAPS; vegetation sampling along ditches next to the haul roads; and background soil and ground-water sampling. The results of the investigation confirmed the presence of widespread radioactive contamination of surface and subsurface soils at the North St. Louis County Sites.

55.     Since 2012, the United States Army Corps of Engineers and its contractors have sampled and studied the surface of Coldwater Creek.[5] Preliminary

[5] Bogan, Jesse, *Concerns linger as completion date for Coldwater Creek cleanup pushed to 2038*, St. Louis Post Dispatch, December 19, 2021 at https://www.stltoday.com/news/local/metro/concerns-

soil samples taken north of Interstate 270, the area in which Plaintiffs lived, have identified areas that "require further action". The completion date for the clean-up project of properties along Coldwater Creek has been pushed back to 2038, instead of the original target date of 2022. As quoted by the St. Louis Post Dispatch, one former resident of the contaminated area has blamed the delay on there being "much more extensive contamination that originally thought."

## TOPOGRAPHY AND DRAINAGE OF CONTAMINANTS

56.     The North St. Louis County and the SLDS sites are located on a modest upland area south of the Missouri River floodplain. The upland area surrounds a topographic depression known as the Florissant Basin.

57.     Coldwater Creek is the major drainage mechanism for the SLAPS, the SLAPS VPs, and the Latty Avenue Properties. It has been designated a Metropolitan No-Discharge Stream. Coldwater Creek flows adjacent to the SLAPS and the SLAPS VPs, then meanders near the HISS, the Futura Site, and other Latty Avenue Properties and continues to flow through northern St. Louis County until it discharges into the Missouri River.

58.     Coldwater Creek floods areas of the North St. Louis County Sites including portions of the SLAPS, the HISS, the Futura Site, and several VPs. The runoff from precipitation that enters Coldwater Creek in a given unit of time greatly exceeds the predevelopment quantities. This runoff overloads Coldwater Creek and increases the likelihood of local and area- wide flooding.

linger-as-completion-date-for-coldwater-creek-cleanup-pushed-to-2038/article_45ee5915-7eff-59d6-a378-7ab4a27d75d7.html.

59. Upon information and belief, the SLAPS and the Latty Avenue VPs, including impacted areas along Coldwater Creek, were contaminated with radium, thorium and uranium. Investigations have determined that contamination levels at the North St. Louis County Sites exceed federal dose limits.

60. On-site sampling at the SLAPS, the HISS and the Futura Sites found elevated levels of hazardous, toxic, and radioactive materials in the groundwater, soils, and air, in excess of regional isotope background values.

61. Defendants' processing, storage, handling and/or disposal of hazardous, toxic, and radioactive materials at the St. Louis FUSRAP Sites have generated significant quantities of substances that are highly toxic to humans and the environment and are carcinogenic.

62. Throughout the history of St. Louis FUSRAP Sites, each Defendant (or its predecessor in interest) caused recurrent releases of hazardous, toxic, and radioactive materials into the environment, in complete disregard for applicable law and for the health and safety of the surrounding communities and the natural environment. These negligent, grossly negligent, and reckless releases occurred in various ways, including through direct and indirect discharges of radioactive and toxic materials into public water bodies, such as Coldwater Creek; the exposure of workers to these materials, who then in turn spread contamination outside the worksite; and the improper disposal of hazardous, toxic, and radioactive materials.

63. These negligent, grossly negligent, and reckless releases have resulted in Plaintiffs' exposure to hazardous, toxic, and radioactive materials.

64.     Upon information and belief, the substances to which Plaintiffs were exposed include, but were not limited to, the natural forms and various isotopes of cesium, thorium, radium, uranium, and radon. Some of these substances were used in the conduct of Defendants' operations, and some were created as by-products or decay ("daughter") products.

**RADIOACTIVE WASTES**

64.     Ounce for ounce, radioactive isotopes are the most toxic materials known to man.

65.     Radiation is a type of energy transmitted over a distance. Some materials spontaneously emit radiation through a process known as radioactive decay.  As these materials decay, they release radiation energy and transform into other radioactive materials which will then also decay by releasing radiation energy and transforming into other materials.

66.     Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, have the ability to penetrate other material.  When radiation energy interacts with other material, it causes a process called ionization[6] which can damage chemical

---

[6]  Ionizing radiation is described as follows in the literature: "Ionizing Radiation is a form of radiation that includes alpha particles, beta particles, gamma rays, x-rays, neutrons, high-speed electrons, high-speed protons, and other particles capable of producing ions.  Ionizing radiation has enough energy to cause changes in atoms through a process called ionization.  Ionization can affect the atoms in living things and depending on the dose and exposure, can pose a serious health risk to humans. Ionizing radiation has sufficient energy to cause chemical changes in cells, causing damage to tissue and DNA in genes."  https://www.epa.gov/radiation/radiation-health-effects

structures. When the "other material" that ionizing radiation passes through is human cells, it can cause damage within those cells resulting in mutation in genetic material which can lead to cancer and other harms.

67. People are exposed to radiation in two ways: external exposure from radioactive material in the environment and internal exposure by radioactive material that has entered the body. Radioactive material can be taken into the body by consuming foodstuffs and liquids with radioactivity in them, by inhaling radioactive gases or aerosol particles, or by absorption through wounds in the skin. The material taken in will internally expose the organs and tissues for as long as it remains inside the body.

68. One characteristic of the impact of exposure to ionizing radiation on the human body through both internal and external exposure is that even if the energy absorbed is low, the biological effects can still be gravely serious. The second characteristic is that there are latent biological effects of radiation.

69. The injuries resulting from exposure to ionizing radiation can also be separated into two categories: somatic injuries and genetic injuries. Somatic injuries are damages to the individual exposed. This can be damages to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system, as well as cancers. Illnesses such as cancers may take a number of years to appear.

70. Genetic injury is damage to the reproductive cells of the exposed individual in the form of mutation of their genetic cells. As a result, the probability

of detrimental effects to the descendants of the exposed persons may greatly increase. These genetic mutations can be passed down to a person's offspring even generations later. These injuries include birth abnormalities and cancer.

71.     One of the most dangerous aspects of radioactive materials is the length of time that radioactive isotopes will persist and accumulate in the environment. As detailed above, radioactive materials decay over time and each radioactive material gives off radiation energy as it decays and transforms into a different material. The rate at which a radioactive isotope decays is measured in half-life. The term "half-life" is defined as the time it takes for one-half of the atoms of a radioactive material to disintegrate. For example, after one half life, there will be one half of the original material, after two half-lives, there will be one fourth the original material, after three half-lives one eight the original sample, and so forth.

## COUNT I – TRESPASS

### (Against all Defendants)

72.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

73.     At the time of the incidents described herein, Plaintiffs were tenants at the French Quarter Apartments located on Normandie Court, in Hazelwood, Missouri.

74.     At all times relevant herein, Plaintiffs maintained a possessory interest in the apartment residences in which each occupied.

75. Defendants generated massive quantities of extremely dangerous radioactive wastes and failed to ensure of their proper disposal.

76. Defendants purchased massive quantities of highly toxic radioactive wastes and failed to properly dispose of these wastes.

77. Defendants intentionally, maliciously, and wantonly disposed of radioactive wastes at a facility unfit to handle such wastes.

78. Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of the possessory interests of Plaintiffs.

79. Defendants have caused these radioactive materials to migrate from Defendants' property and other storage locations and contaminate the property in which Plaintiffs had a possessory interest.

80. Defendants willfully, wantonly, and maliciously caused the emission of radioactive particles onto and around the property in which Plaintiffs maintained a possessory interest through their improper disposal of radioactive wastes.

81. It was reasonably foreseeable that Defendants' actions would contaminate the property in which Plaintiffs maintained a possessory interest with radioactive particles and other hazardous wastes.

82. Defendants stored and/or transported radioactive materials and other toxic and hazardous wastes, as alleged herein.

Electronically Filed - St Louis County - January 25, 2022 - 11:13 AM

83. Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of Plaintiffs' possessory interest in the property.

84. Defendants have caused these radioactive materials to migrate and contaminate the property in which Plaintiffs maintained a possessory interest.

85. Defendants willfully, wantonly, and maliciously caused the emission of Radon gas, and radioactive particles onto and around the property in which Plaintiffs maintained a possessory interest through their use, transport and disposal of radioactive wastes.

86. It was reasonably foreseeable that Defendants' actions would contaminate the property in which Plaintiffs maintained a possessory interest with radioactive particles and other hazardous wastes.

87. The migration of Radon gas and radioactive particles onto the property in which Plaintiffs maintained a possessory interest caused by Defendants has resulted in personal injury to Plaintiffs.

88. Plaintiff did not give Defendants permission or consent to interfere with the property in which Plaintiffs' maintained a possessory interest. Through Defendants' actions and inactions, they are illegally and improperly using in which Plaintiffs maintained a possessory interest to store radioactive wastes.

89. The contamination of the property in which Plaintiffs maintained a possessory interest with Radon gas and radioactive particles, and other hazardous wastes, has resulted in significant injury to Plaintiffs.

90.    As a direct and proximate cause of this continuing and recurring physical interference, Plaintiffs have suffered and continue to suffer personal injury, including multiple myeloma, and have incurred damages, including, but not limited to, medical bills and expenses.

WHEREFORE, Plaintiffs Nikki Mazzocchio and Angela Kraus respectfully request this Court enter judgment against Defendants on Count I of this Petition in an amount in excess of $25,000.00, and any other relief this Court deems just and necessary.

## COUNT II – Temporary Nuisance

### (Against all Defendants)

91.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

92.    At the time of the incidents described herein, Plaintiffs were tenants at the French Quarter Apartments located on Normandie Court, in Hazelwood, Missouri.

93.    At all times relevant herein, Plaintiffs maintained a possessory interest in the apartment residences in which each occupied.

94.    Defendants unreasonably and unlawfully stored and used radioactive materials at the St. Louis Airport Site ("SLAPS"), the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek, which adjoins the property in which Plaintiffs had a possessory interest.

95. The Defendants caused and contributed to the radioactive contamination of the property in which Plaintiffs had a possessory interest.

96. The radioactive waste caused by Defendants results from permanent construction that was necessarily injurious to Plaintiffs as installed.

97. Operating an unlicensed radioactive hazardous waste dump in a populated area is a nuisance *per se*.

98. Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of Radon gas and radioactive particles onto and around the property in which Plaintiffs had a possessory interest, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their property. Such contamination was incompatible with the normal use and enjoyment of the property in which Plaintiffs had a possessory interest.

99. Defendants' interference with Plaintiffs' use and enjoyment of the property in which Plaintiffs had a possessory interest was substantial.

100. Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of noxious, offensive odors and various hazardous substances into the surrounding air resulting in unreasonable interference with Plaintiffs' use and enjoyment of the property in which Plaintiffs had a possessory interest.

101. Defendants' continuous and unrelenting noxious odors invading the property in which Plaintiffs had a possessory interest caused inconvenience to Plaintiffs and prevented them from using the property.

102.   As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property in which Plaintiffs had a possessory interest, Plaintiffs have suffered permanent injury, including multiple myeloma and have incurred damages, including, but not limited to, medical bills and expenses.

WHEREFORE, Plaintiffs Nikki Mazzocchio and Angela Kraus respectfully request this Court enter judgment against Defendants on Count II of this Petition in an amount in excess of $25,000.00, and any other relief this Court deems just and necessary.

## COUNT III – Permanent Nuisance

### (Against all Defendants)

103.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

104.   At the time of the incidents described herein, Plaintiffs were tenants at the French Quarter Apartments located on Normandie Court, in Hazelwood, Missouri.

105.   At all times relevant herein, Plaintiffs maintained a possessory interest in the apartment residences in which each occupied.

106.   Defendants unreasonably and unlawfully stored and used radioactive materials at the St. Louis Airport Site ("SLAPS"), the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek, which adjoins the property in which Plaintiffs had a possessory interest.

107. The Defendants caused and contributed to the radioactive contamination of the property in which Plaintiffs had a possessory interest.

108. The Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allow the emission of Radon gas and radioactive particles onto and around the property in which Plaintiffs had a possessory interest, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their the property in which Plaintiffs' had a possessory interest.

109. Defendants' interference with Plaintiffs' use and enjoyment of the property was substantial.

110. Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed various hazardous substances into Coldwater Creek resulting in unreasonable interference with Plaintiffs' use and enjoyment of the property in which Plaintiffs' had a possessory interest.

111. Defendants' use of the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek prevented Plaintiffs from using the property in which Plaintiffs' had a possessory interest.

112. As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property in which Plaintiffs' had a possessory interest, Plaintiffs have suffered and continue to suffer injury, including multiple myeloma and have incurred damages, including, but not limited to, medical bills and expenses.

WHEREFORE, Plaintiffs Nikki Mazzocchio and Angela Kraus respectfully request this Court enter judgment against Defendants on Count III of this Petition in an amount in excess of $25,000.00, and any other relief this Court deems just and necessary.

## COUNT IV – Negligence

### (Against all Defendants)

113.    Plaintiffs re-allege and incorporate by reference every allegation of this Petition as if each were set forth fully herein.

114.    Radioactive isotopes are known human carcinogens and are among the most toxic materials known to man.  When property becomes contaminated with these wastes, the dangers can persist in the environment for thousands of years. Radioactive wastes should be handled, stored, and disposed of with the utmost safety in mind.  Exposures to radioactive wastes should be as low as is reasonably achievable.

115.    Knowing of the grave dangers posed by these wastes, the Defendants owed a duty of care to the Plaintiffs and the public to ensure the safe and legal handling, storage, and disposal of the radioactive wastes in order to prevent significant injury to property and persons.

116.    Defendants also had a specific duty to warn or notify Plaintiffs of the potential hazards of exposure to radioactive, toxic and hazardous substances, and to warn or notify Plaintiffs of the fact that discharges or releases of these substances had occurred and were likely to occur in the future.

117.    Further, Defendants had a duty to comply with applicable state, federal, and local governmental laws, regulations, and guidelines applicable to persons processing, handling, storing, and/or disposing of hazardous, toxic, and radioactive waste materials.

118.    Defendants breached these duties by their reckless, negligent and grossly negligent processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials as alleged herein. Such conduct was in utter non-compliance with applicable federal, state and local laws, regulations, and guidelines. Defendants' reckless, negligent, grossly negligent, and illegal conduct resulted in the dangerous release of hazardous, toxic, and radioactive substances into the communities around Coldwater Creek. These actual and continued releases have subjected Plaintiffs to an unreasonable risk of harm, and to actual injuries to their persons.

119.    Defendants also failed to warn Plaintiffs of the actual and threatened releases of such hazardous, toxic, and radioactive substances and of the reasonably foreseeable effects of such releases, an omission that was reckless, negligent and grossly negligent.

120.    Defendants failed to act to prevent their releases from harming Plaintiffs.

121.    Defendants knew or should have known that their generation, management, storage, use, disposal, releases, or discharges of radioactive, toxic and

hazardous substances in as alleged herein would result in actual and increased risks of damage to Plaintiffs.

122. Upon information and belief, Defendants' negligent training of personnel handling radioactive, toxic, and hazardous materials on site was a direct and proximate cause of damage to Plaintiffs.

123. Defendants' negligence throughout the history of the mishandling and improper dumping of hazardous, toxic, carcinogenic, radioactive wastes has resulted in repeated releases of Radon gas, radioactive particles and other hazardous materials onto the property in which Plaintiffs' had a possessory interest, in disregard of applicable regulations and property rights.

124. Defendants' negligence has damaged Plaintiffs by causing significant injuries, including multiple myeloma and have incurred damages, including, but not limited to, medical bills and expenses.

125. The injuries sustained by Plaintiffs are of the kind that do not occur without negligence.

126. Plaintiffs' injuries were the result of wastes generated, disposed of, and controlled by Defendants.

127. Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

WHEREFORE, Plaintiffs Nikki Mazzocchio and Angela Kraus respectfully request this Court enter judgment against Defendants on Count IV of this Petition in

an amount in excess of $25,000.00, and any other relief this Court deems just and necessary.

## COUNT V – Negligence Per se

### (Against all Defendants)

128. Plaintiffs re-allege and incorporate by reference every allegation of this Petition as if each were set forth fully herein.

129. Defendants violated Missouri regulations for Protection against Ionizing Radiation, 19 C.S.R. 20-10.070, 20-10.090, Missouri Solid Waste Management Law and Regulations, 10 C.S.R. 80-2.020(1)(F), 80-3.010(3)(A)(2), 80-3.010(3)(B)(1), 80-3.010(8)(A), 80-3.010(9)(C)(2), 80-3.010(13)(C), 80-3.010(14)(C), 80-3.010(19)(A), 10 CSR 80-3.010(19)(C)(7); Mo. Rev. Stat. §§ 260.210.1(4), 260.380(1); Missouri Clean Water Act, Mo. Rev. State. § 644.051.1, and Missouri Air Conservation regulations, 10 C.S.R. 10-6.165, all of which require the safe storage and disposal of radioactive material so as to protect the health and safety of the public.

130. Plaintiffs are members of the class of persons that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were intended to protect.

131. Plaintiffs' injuries are the kind of injuries that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, Missouri Hazardous Waste Management Law, and Missouri Air Conservation regulations were designed to prevent.

132. Defendants' violations of Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were the proximate cause of Plaintiffs' injuries.

133. Defendants' negligence throughout the history of the mishandling and improper dumping of radioactive wastes in the St. Louis area has resulted in repeated releases of Radon gas and radioactive particles and other hazardous materials onto the property in which Plaintiffs maintained a possessory interest in violation of applicable regulations.

134. Defendants' negligence has damaged Plaintiffs' by causing personal injury, including multiple myeloma and have incurred damages, including, but not limited to, medical bills and expenses.

135. Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

WHEREFORE, Plaintiffs Nikki Mazzocchio and Angela Kraus respectfully request this Court enter judgment against Defendants on Count V of this Petition in an amount in excess of $25,000.00, and any other relief this Court deems just and necessary.

## COUNT VI – Strict Liability/Absolute Liability

### (Against all Defendants)

136. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

137.    Defendants engaged in the abnormally dangerous activity of handling, storing, and/or disposing of radioactive waste.

138.    By handling, storing, and/or disposing of radioactive waste, Defendants have created a high degree of risk of harm to Plaintiffs.

139.    Defendants have intentionally failed to eliminate the risk of harm caused by their handling, storing, and/or disposing of radioactive waste.

140.    As a direct result of Defendants' abnormally dangerous activities, Plaintiffs were injured by radioactive materials and they suffered and continue to suffer injury, including multiple myeloma and have incurred damages, including, but not limited to, medical bills and expenses.

141.    Plaintiffs' injuries are of the kinds that result from the dangerous nature of handling, storing, and/or disposing of radioactive waste.

142.    The injuries that Defendants' handling, storing, and/or disposing of radioactive waste have caused Plaintiffs to suffer, drastically outweigh the value of the said activities.

143.    Accordingly, Defendants are jointly and severally liable for any and all damages Plaintiffs have sustained as a result of their strict liability for handling, storing and/or disposing of radioactive materials, including, without limitation, any incidental or consequential damages.

WHEREFORE, Plaintiffs Nikki Mazzocchio and Angela Kraus respectfully request this Court enter judgment against Defendants on Count VI of this Petition in

an amount in excess of $25,000.00, and any other relief this Court deems just and necessary.

Respectfully submitted,

KEANE LAW LLC

By: <u>/s/ *Ryan Keane*</u>
Ryan A. Keane, # 62112
Steven W. Duke, # 68034
7777 Bonhomme Ave, Ste 1600
St. Louis, MO 63105
Ph: (314) 391-4700
Fx: (314) 244-3778
ryan@keanelawllc.com
steve@keanelawllc.com

*Attorneys for Plaintiffs*

Electronically Filed - St Louis County - January 25, 2022 - 11:13 AM