# Exhibit 2

CENTRAL FILES

JUN 1 0 1977

Westlake Lift
MC00797co13

Mrs. Carolyn Ashford
Director, Missouri Department
  of Natural Resources
P.O. Box 1363
Jefferson City, MO 65101

Dear Mrs. Ashford:

This refers to a special investigation conducted by this office
to obtain information pertaining to the disposal of natural
uranium ore residues in a St. Louis County landfill area by
the Cotter Corporation during 1973. This also refers to the
discussions held with Messrs. K. V. Miller and G. MacNutt of
the State of Missouri Bureau of Radiological Health in
St. Louis on June 6 and 7, 1977, at which time a copy of our
investigation report was furnished to them. Although there
were no items of noncompliance with NRC requirements found
during this investigation, the NRC believes that a more detailed
environmental evaluation of these sites should be conducted.

As discussed with Messrs. Miller and MacNutt, the Nuclear
Regulatory Commission has arranged for the Oak Ridge National
Laboratory to perform such a survey at the St. Louis landfill
site, as well as at the property formerly occupied by the
Cotter Corporation. You will be kept fully informed of the
results of that survey.

                            Sincerely,

                            James G. Keppler
                            Director

cc:  Jarboe Realty and
     Investment Company
     Norfolk and Western Railroad

cc w/IE Investigation Report No. 76-01
   Cotter Corporation
√ Central Files
   Reproduction Unit NRC 20b
   PDR
   NSIC

40057825
SUPERFUND RECORDS

| OFFICE ▸ | RIII | RIII | RIII | RIII | |
| BURNAME ▸ | Pagliaro/bk | Allan U. | Norelius | Keppler | |
| DATE ▸ | 6/10/77 | | | | |

UNITED STATES NUCLEAR REGULATORY COMMISSION
OFFICE OF INSPECTION AND ENFORCEMENT

### REGION III

IE Investigation Report No. 76-01

Subject:  Cotter Corporation
Hazelwood, Missouri
License No. SUB-1022 (Terminated)

Allegations regarding the disposal of uranium
ore residues were partially substantiated.

Period of Investigation:  June 22-24, and August 11, 1976

Investigators:  _____     1-4-77
G. A. Phillip                   (Date)
(6/22-24/76)

_____     1-4-77
W. B. Grant                     (Date)
(6/22-24/76 and 8/11/76)

_____     1/4/77
A. G. Januska                   (Date)
(8/11/76)

_____     1/4/77
B. L. Jorgensen                 (Date)

Reviewed By:  _____     1/5/77
G. T. Lonergan, Chief           (Date)
Materials Radiological
Protection Section

_____     1/5/77
J. A. Pagliaro, Chief           (Date)
Environmental and Special
Projects Section
(10/20/76)

## REASON FOR INVESTIGATION

Following receipt of a letter dated June 2, 1976, from the Missouri Department of Natural Resources, forwarding newspaper articles containing allegations regarding the disposal of uranium ore residues, Region III initiated an investigation.

## SUMMARY OF FACTS

A report on an inspection conducted by Region III on April 10 and 21-24, 1974,[1] stated that according to licensee representatives the stockpile of the source material previously stored by Cotter Corporation under License No. SUB-1022 at 9200 Latty Avenue, Hazelwood, Missouri, had been shipped to its facilities in Canon City, Colorado by mid-1973 with the exception of 8700 tons of leached barium sulfate. The report further states: "Records maintained by Cotter Corporation showed that this material contained from 0.05% to 0.1% or approximately 7 tons of uranium as $U_3O_8$. Licensee representatives stated, and records of invoices paid to B&K Construction Company show, that this material along with approximately 38,000 to 39,000 tons of soil removed from the top 12 to 18 inches of the Latty Avenue site was disposed of in St. Louis County sanitary landfill area No. 1 on Old Bridge Road over the period July 31 through October 12, 1973." The report further states: "This material was hauled to the landfill area and used as cover for part of the several hundred truckloads of garbage and refuse that are shipped to the landfill area site every week. The licensee estimates that the barium sulfate is probably buried under 100 feet of garbage at this time. The trucks were hosed out after hauling this material."

Subsequently, on November 13, 1974, in response to a request from Cotter Corporation, License No. SUB-1022 was terminated.

By letter dated June 2, 1976, the Director, Division of Environmental Quality, Missouri Department of Natural Resources, sent copies of news articles appearing on May 30 and June 1, 1976 in the St. Louis Post-Dispatch which indicated that the information in the inspection report was inaccurate. Specifically, the news articles indicated that:

a)   Only 9 tons of waste rather than nearly 40,000 tons of waste and soil had been moved from the Latty Avenue site.

b)   The material was dumped at West Lake Landfill rather than St. Louis County landfill No. 1.

In his letter the Director, Division of Environmental Quality, stated that the depth at which the material was reportedly buried must be

[1]/ RO Inspection Report No. 040-8035/74-01.

- 2 -

incorrect since no St. Louis area landfills contained 100 feet of fill.

It was ascertained that:

a. During the period July 16 to October 9, 1973, over 43,000 tons of waste and soil were removed from the Latty Avenue site.

b. The 43,000 tons of waste and soil were dumped at the West Lake Landfill.

c. The material dumped at West Lake Landfill is covered by about 3 feet of other soil.

The inaccurate information in Inspection Report No. 040-8035/74-01 regarding the identification and location of the landfill area apparently resulted from miscommunication between the inspector and the B&K Construction Company representative. The erroneous information regarding the depth at which the residue was reportedly buried was based upon information furnished by the licensee who expressed this offhand opinion.

Environmental samples were taken and beta-gamma surveys were made at the Latty Avenue and West Lake Landfill sites on August 11, 1976. The Latty Avenue site and environs was revisited on October 20, 1976, for additional environmental samples and alpha, beta-gamma direct surveys. The report for the October 20, 1976 visit appears as Attachment D in this report. The Latty Avenue environmental samples confirm the removal of the bulk of materials but show that some residues remain. The Latty Avenue surveys showed radiation levels exceeding NRC criteria for decontamination of land areas prior to return to unrestricted use. The West Lake Landfill surveys indicated that radioactive material is buried there, and one environmental sample showed a slightly elevated natural uranium concentration. Based on the direct radiation surveys, neither site presents an immediate radiological health hazard to the public.

For the environmental transport pathways evaluated, a hazard analysis indicates that the material disposed of at the West Lake Landfill does not pose any immediate hazard to the public presuming the presence of 7 tons of natural uranium.

Solubility tests of the soil samples were not conducted, however, $U_3O_8$ combined with barium sulfate is known to be insoluble in water. Groundwater was not available for sampling at the West Lake Landfill site. A sediment and surface water sample was taken from a creek near the Latty Avenue site.

No items of noncompliance were identified during this investigation.

- 3 -

## SCOPE OF INVESTIGATION

This investigation was conducted to determine the circumstances relating to the disposition of about 8700 tons of leached barium sulfate from the former licensee's facility at Hazelwood, Missouri and consisted of a review of pertinent records, independent sampling and measurements and interviews of individuals.

## CONCLUSIONS

1.  About 8700 tons of leached barium sulfate containing about 7 tons of $U_3O_8$ were mixed with about 39,000 tons of soil at the Latty Avenue site as reported by the licensee during the April, 1974 inspection.  The residue-soil mixture was transported to the West Lake Landfill area in St. Louis County where it is covered by approximately 3 feet of other soils instead of 100 feet as reported by the licensee during the April, 1974 inspection.

2.  Environmental soil samples indicate the continuing presence of some uranium and thorium ore process residues at the Latty Avenue site.  Beta-gamma surveys performed by IE:III personnel at that site on August 11 and October 20, 1976, indicate levels of direct radiation exceeding the criteria established by NRC for decontamination of land areas prior to release for unrestricted use.  Further, these levels were found to be greater than those reported by the licensee in his application for termination of the license dated May 10, 1974.

3.  Based on direct radiation measurements of the material present at the West Lake Landfill and at the Latty Avenue site, neither location presents an immediate direct radiation health hazard to the public.

4.  It is estimated, using uniformly conservative assumptions, that the concentration of natural uranium in the West Lake Landfill could result in increased airborne concentrations of radon 222 and its progeny, directly over buried materials, of about one-half of the 10 CFR 20 limits for unrestricted areas.

5.  It is known that significant increases in indoor radon 222 concentrations can be experienced in dwellings built in or on disposed tailings.  Physical and chemical differences between tailings materials, however, prohibit a direct comparison between what might occur in dwellings constructed in the West Lake Landfill as against the results of previous studies.  A complete environmental impact analysis, specific to the materials at the landfill, should be performed to quantify the potential for radon buildup in dwellings built at the landfill.

- 4 -

## DETAILS

### Introduction

By letter dated June 2, 1976, Mr. Kenneth M. Karch, Director, Division of Environmental Quality, Missouri Department of Natural Resources, forwarded to Region III copies of articles published in the St. Louis Post-Dispatch on May 30 and June 1, 1976 which he stated in his letter ". . . presented evidence that some seven tons of uranium were dumped in 1973 at the West Lake Landfill in St. Louis County by an Atomic Energy Commission subcontractor removing radioactive waste material from a site in Hazelwood, Missouri." Mr. Karch stated in his letter that: "The investigation by the Post-Dispatch indicates that AEC did not know the correct location of the dumping, the local geology, nor the actual concentration of uranium dumped. The depth cited must also be incorrect since no landfills in the St. Louis area contained 100 feet of fill." A copy of Mr. Karch's letter with news articles attached is attached to this report as Exhibit A.

By letter dated June 17, 1976, Region III responded to Mr. Karch pointing out that Cotter Corporation, which was responsible for the burial, was an AEC licensee, not an AEC subcontractor and advising him, therefore, that the matter would be investigated by NRC. A copy of Region III's letter is attached to this report as Exhibit B.

### Background

In early 1966 the Continental Mining and Milling Company, Chicago, Illinois, purchased from the Atomic Energy Commission ore residues which were stored at the St. Louis Airport. The material was moved from that site during 1966 to the 9200 Latty Avenue, Hazelwood, Missouri site. Continental Mining and Milling Company possessed License No. SMA-862 for this program. In January 1967 the Commercial Discount Corporation of Chicago, Illinois took physical possession of the stockpile. License No. SMC-907 was issued to Commercial Discount Corporation on December 29, 1966 allowing possession of the residues, removal of moisture and shipment to the Cotter Corporation facilities in Canon City, Colorado. In December 1969 the remaining source material was sold to Cotter Corporation who obtained License No. SUB-1022 dated December 31, 1969. The AEC's invitation to bid listed the following residues for purchase: 74,000 tons of Belgium Congo pitchblende raffinate containing about 113 tons of uranium; 32,500 tons of Colorado raffinate containing about 48 tons of uranium; and 8700 tons of leached barium sulfate containing about 7 tons of uranium.

In August 1970, Cotter Corporation began drying and shipping the remaining residues from the St. Louis site to their mill in Canon City, Colorado at the rate of about 400 dry tons of material per day. This operation was performed for Cotter Corporation by B&K Construction

- 5 -

Company and continued until about November 1970. During the August to November period, all of the residues were shipped to Canon City with the exception of approximately 10,000 tons of Colorado raffinate and 8700 tons of leached barium sulfate. There was no further activity at the Latty Avenue site until mid-1973.

During an inspection conducted in April 1974, a Region III inspector was informed that during the period July-October 1973, the remaining Colorado raffinate was shipped to Canon City without drying and the leached barium sulfate along with 38,000 to 39,000 tons of soil had been disposed of in a landfill area in St. Louis County. The leached barium sulfate contained from 0.05% to 0.1% uranium as $U_3O_8$. Twelve (12) to eighteen (18) inches of the topsoil was stripped from the Latty Avenue site and disposed of with the leached barium sulfate.

### Visit to Cotter Corporation, Lakewood, Colorado

On June 22, 1976, the following information was obtained during a visit to the Cotter Corporation, Lakewood, Colorado offices. Mr. David P. Marcott, Executive Vice President of Cotter Corporation, stated that all of the source material once stockpiled at the Latty Avenue site had been shipped by rail to its facility in Canon City, Colorado, except the approximate 8700 tons of leached barium sulfate. The material had very low concentrations of uranium, from 0.05% to 0.1%, and it was considered commercially impractical to further process this material to remove the uranium. He indicated that it would be necessary to process the material with several hundred pounds of hydrochloric acid to leach a pound of uranium from each ton of the barium sulfate. If the uranium could be leached out using water the licensee would certainly have processed the material rather than disposing of it. He indicated that for this reason he was confident that the uranium remaining in the leached barium sulfate now located in a landfill would not leach out into the groundwater. He said that the average uranium content of ore currently being processed by the mining industry was 0.16% which is greater than that disposed of in the St. Louis area. He indicated that some ore being processed by Cotter Corporation contains 0.65% uranium. He indicated that in his opinion the uranium contained in the leached barium sulfate did not constitute any threat to the environment wherever it is now located.

Marcott further advised that he visited the site on more than one occasion in 1973. He indicated that on one occasion Mr. Robert Davis of B&K Construction Company drove him around the area and pointed out to him the landfill area where the material would be dumped. He said he could not recall the name or location of the area. It was his recollection that the landfill area had a large deep pit. It was on this basis that he had expressed the opinion that the material was probably buried under 100 feet of soil and garbage. He indicated that he also visited the Latty Avenue site on another occasion and personally saw the trucks removing the dirt from the premises.

- 6 -

Marcott stated that B&K supplied weight sheets along with the invoices submitted for payment for disposing of the barium sulfate and dirt from the Latty Avenue site.  These invoices also included charges for the Colorado raffinate shipped by rail to Canon City during the same period of time.

Mr. Duane A. Dughman, Vice President-Finance of Cotter Corporation, provided copies of 11 invoices for the period July to October 1973. These invoices showed a total of 48,544.70 tons of material were trucked to a disposal site which is not identified on the invoices.  The invoices also showed that 10,763.41 tons of material were shipped by rail during the same period.

Dughman stated that he had reviewed all related records in Cotter's files and none of them identified the landfill area to which B&K Construction had taken the material.  Dughman stated that the only papers relating to the Latty Avenue site not contained in the master files in the Lakewood, Colorado offices were the weight sheets that had accompanied B&K's invoices.  He indicated that these had been retained at the Canon City facility.  He made an inquiry by telephone of personnel at the Canon City facility concerning the weight sheets and was advised that they couldn't be located.  It was indicated that Mr. Warren Goff, who was away and not scheduled to return for several days, was the only one who could locate them.

Copies of the 11 invoices were obtained and copies of them, with the cost entries deleted, are attached to this report as Exhibit C.

Visit to West Lake Landfill, Bridgeton, Missouri

On June 23, 1976, the following information was obtained from Mr. Vernon Fehr, Superintendent of Plant No. 1 West Lake Landfill.

Fehr indicated that he recalled that about three years ago, B&K Construction Company had dumped what he understood to be clean fill in an area adjacent to the office building.  He indicated that he had seen the material being dumped and it looked like ordinary dirt to him. Since clean landfill is useful as cover, there is no charge for dumping it and no records are maintained of its receipt.  It was his recollection that the dumping of the material did not involve any formal arrangements. The truck drivers just came to the site and he told them where to dump it.  He stated that he could identify the specific location where the material was dumped and estimated that it was three feet down.  While he recalled that a large quantity of material was dumped, he was some-what doubtful that it totalled 39,000 tons.

Fehr advised that in 1974 the Missouri Department of Natural Resources advised West Lake to discontinue dumping in two areas on the site, one of those being the area where the B&K material was located.  He indicated that this area was full anyway.  He went on to say that the State required them to sink wells around the area so that samples of the groundwater could be obtained.  He indicated that the State

- 7 -

obtained and analyzed groundwater samples from the wells and did not report any problems regarding their findings. He said the wells are still there.

## Telephone Contacts with Ryckman, Edgerley, Tomlinson & Associates, St. Louis Missouri

On June 23, 1976, telephone contacts were made with Dr. E. Edgerley and with Mr. Phillip K. Feeney of Ryckman, Edgerley, Tomlinson & Associates, an environmental engineering firm that provided consultant services to Cotter Corporation on health physics and site decontamination.

Dr. Edgerley stated that while he had visited the Cotter Corporation Latty Avenue site when the residues were being dryed and shipped to Canon City, Colorado, he had no personal knowledge concerning the disposal of the material remaining onsite after these operations were discontinued.

Mr. Feeney stated that he was aware that the topsoil was stripped from the Latty Avenue site and trucked to a landfill but he did not know which one. He indicated that arrangements regarding the disposal operations were made directly between Cotter Corporation and B&K Construction Company. Feeney stated that he visited the site to perform a termination survey after being informed that the disposal operations were completed. During the first survey he made he found one small spot above 0.6 mR/hr. He instructed B&K to remove some dirt from this area which he indicated would be a truckload or less. Subsequently, he returned to the site and found less than 0.1 mR/hr. By letter dated May, 1974, the results of Feeney's survey were furnished to Cotter Corporation. A copy of this letter with its attachments appears as Exhibit D in this report.

## Visit to B&K Construction Company, St. Ann, Missouri

On June 24, 1976, Mr. Robert S. Davis, Vice President, B&K Construction Company, was interviewed. Davis stated that the amount of material shown on the invoices submitted to Cotter Corporation was disposed of by trucking to the West Lake Landfill during the period July 16 to October 9, 1973 with the exception of 5,000 tons. He indicated that this 5,000 tons represented topsoil stockpiled in one corner of the Latty Avenue site. He had removed it and then returned it to the site after disposal operations were completed. This topsoil along with other topsoil was used to dress the site. He felt that he should be paid for handling the stockpiled topsoil and that the 5,000 tons was included in the amounts on the invoices sent to Cotter Corporation.

Davis stated that while there was no charge for dumping the material at West Lake, he had arranged to have the individual operating the scales there to record the weights of each truck on sheets of paper. He indicated he was required by Cotter Corporation to submit these weight sheets with the invoices. Davis provided copies of the weight sheets which bear the heading "B&K Dirt Hauling" and the date. The following information is

- 8 -

recorded: truck number, gross, tare, and net weights. A spot check was made of the totals of the net weights shown on the sheets as well as the totals of the net weights for a billing period with the weights on the covering invoice. No discrepancies were found. There were a total of 104 weight sheets associated with these invoices. The total weight of material trucked to the disposal area shown on the invoices was 48,544.70 tons. Subtracting the 5,000 tons of topsoil referred to above, the amount of material trucked to the disposal area was 43,544.70 tons. The invoices also show a total of 10,763.41 tons of material were shipped by rail to Canon City.

Although the above invoices and weight sheets did not indicate the disposal area to which the material was taken, Davis stated that it was taken to the West Lake Landfill. He offered for review a job card record relating to the Latty Avenue site and several entries were noted for the period July 16, 1973 to October 10, 1973 which indicated residue was taken to West Lake from Cotter, Latty Avenue.

Davis also stated that in addition to using his own trucks, he arranged for much of the hauling to be done by other trucking firms. He made available for review from his records, bills from these firms. Weekly billing statements, with drivers time tickets attached, covering the period August 3, 1973 to October 12, 1973 were noted from Walker Trucking Service, Ferguson, Missouri. These billing statements contain the notation "Latty Avenue to West Lake." Billings were also reviewed which had been received from the following: Bruce Barnes Truck Service, St. Louis; Vic Koepke Excavating and Grading Company, Bridgeton; and H. Reeder Hauling, Inc., St. Louis. On at least some of these billings, there are entries showing that material was hauled from "Latty Avenue" or "Cotter" to West Lake.

It is concluded that the material in question is now buried under about three feet of clean soil at the West Lake Landfill. While little significance was attached to the actual location of the disposed material at the time of the 1974 inspection, the licensee was notified, by letter dated November 1, 1974, that the disposal did not appear to be within the intent of the Commission's 10 CFR 40 regulations (Exhibit E) concerning alteration of source material to obtain a mixture no longer subject to licensing.

### Visit to Latty Avenue, Hazelwood, Missouri Site and West Lake Landfill, Bridgeton, Missouri Site

On August 11, 1976, two Inspection and Enforcement Region III inspectors visited the Latty Avenue site and West Lake Landfill site for the purposes of performing radiation surveys and collecting environmental samples. The Region III inspectors were accompanied by Mr. Stephen Nagle to the Latty Avenue site and Mr. Clarence Stein to the West Lake Landfill site. Messrs. Nagle and Stein represented the State of Missouri Division of Environmental Quality, Department of Natural Resources.

The results of the August 11, 1976 surveys of the Latty Avenue site and the West Lake Landfill site with a narrative and reference material are attached to this report as Attachment A.

Results of the analyses of the environmental samples taken on August 11, 1976 from the Latty Avenue site and West Lake Landfill site are attached to this report as Attachment B.

Measurements performed at the West Lake Landfill and analyses of samples from the area have been reviewed. The following hazard analysis is based on the measurements and analyses and on information derived from personnel of the former licensee.

## Direct Radiation - West Lake Landfill

Beta-gamma measurements made at three feet from the surface indicate two general areas where readings above background were noted. These measurements indicated 0.06 mrad/hr maximum. The measurements at contact indicated 0.8 mrad/hr maximum, and about 0.1 mrad/hr average. Thus, for continuous exposure the maximum gonadal or whole body dose would be:

$$0.06 \text{ mrad/hr} \times 8.76 \times 10^3 \frac{\text{hrs}}{\text{year}} \cong 500 \text{ millirads/year or approximately } 500 \text{ millirems/year.}$$

However, the area has been closed for dumping by Missouri DNR and is essentially unoccupied.

## Calculated Atmospheric Concentrations of Rn-222 at West Lake Landfill

West Lake Landfill area sample analytical results do not indicate the presence of significant natural uranium activity. These surface samples, however, would not be expected to be representative of material which is reportedly covered by overburden with a thickness of approximately one meter.

According to information provided by the licensee, the covered material consists of approximately 7 tons of natural uranium in about 8,700 tons of barium sulfate and about 39,000 tons of soil. Thus, an approximate natural uranium weight percentage of the mixture would be 0.015 percent. With a natural uranium specific activity of $6.77 \times 10^{-7}$ Ci/g, the specific activity of the mixture would be approximately $1.0 \times 10^{-10}$ Ci/g or $1.0 \times 10^{-4}$ uCi/g. Analysis of two surface samples from the Latty Avenue site (source of the covered material) indicated natural uranium concentrations of approximately $1.0 \times 10^{-4}$ uCi/g, which supports this estimate of average mixture concentration. The Ra-226 analysis showed an average concentration of about $1.0 \times 10^{-3}$ uCi/g for the two samples.

- 10 -

Calculations have been performed to estimate radon-222 emanation from the ground, due to buried material with an average Ra-226 concentration of $1.0 \times 10^{-3}$ uCi/g below a depth of 100 cm. These calculations indicate a total release of approximately 0.1 uCi/sec of radon-222 from the ground due to the covered tailings mixture. It should be noted that the assumed depth of burial yields a reduction of about a factor of three below what emanations would exist, assuming no cover.

Additional calculations were performed using the "virtual point source" method for determining average air concentration of radon-222 above the covered material. The area was estimated to be approximately square, with a dimension of forty meters. This calculation yielded an approximate atmospheric dispersion coefficient in the center of the area of $1.7 \times 10^{-2}$ sec/$m^3$.

Applying this coefficient to the release rate of 0.1 uCi/sec yields an average increase in background air concentration of $1.7 \times 10^{-3}$ uCi/$m^3$ directly over the covered tailings, which is about one-half of the 10 CFR 20 unrestricted area concentration limits. This Rn-222 contribution in air, due to the buried materials, would be indistinguishable from background within a few hundred meters from the landfill. Based on the conservatism of assumptions, this atmospheric concentration of Rn-222 is considered an upper limit. Calculations are appended to this report as Attachment C.

Other Pathways

Pathways other than direct exposure and inhalation of radon-222 and progeny do not appear to be significant. No likely means of an ingestion pathway were identified, and inhalation due to fumigative dusting can be discounted since the material is covered and not subject to becoming airborne. An evaluation of the potential for groundwater contamination could not be made in the absence of information concerning the hydrogeologic character of the local area. Three shallow (about 20 feet) wells in the area were all found to be dry at the time the IE:III inspectors visited the site, precluding collection and analysis of groundwater samples. As noted above, barium sulfate and $U_3O_8$ are known to be insoluble in water.

Future Development

It is noted that the radium 226 concentration of materials presumed buried at the West Lake Landfill approximates that found in tailings materials used for leveling, aggregate and backfill under or around the foundations of dwellings in certain western Colorado communities. Some of these Colorado dwellings experience indoor radon 222 concentrations capable of yielding exposures approaching those implied in the occupational limits of 10 CFR 20. Differences in the physical and chemical natures of the West Lake Landfill and the western Colorado tailings, however, suggest a lower radon release fraction for materials of the type buried at the land fill. Recognizing the potential for radon buildup in

- 11 -

dwellings and the uncertainties concerning certain parameters needed to estimate that potential at the West Lake Landfill, a complete environmental impact assessment is necessary to accurately evaluate the hazard potential for this pathway.

## Comparison with 10 CFR 20 Criteria

Finally, it should be noted that a licensee may bury up to about two tons of natural uranium per year (in twelve increments) within criteria contained in 10 CFR 20 concerning depth (4 feet) and spacing (6 foot spacing between locations). Thus, in four years, eight tons could be disposed of in forty-eight one-sixth ton batches buried in a grid with six foot centers. Such a grid would comprise an area significantly smaller than that found in this case, while containing about the same quantity of disposed uranium.

```
    0   0   0   0   0   0   0

    0   0   0   0   0   0   0

    0   0   0   0⁶ ᶠᵗ0   0   0

    0   0   0⁶ ᶠᵗ0   0   0   0        36 ft ≈ 11 m

    0   0   0   0   0   0   0

    0   0   0   0   0   0   0

    0   0   0   0   0   0   0

    36 ft ≈ 11 m
```

## Conclusion

Seven tons of uranium could be disposed of by burial in accordance with 10 CFR 20.304 in an area significantly smaller than that now existing at the West Lake Landfill. Based on our estimates of maximum potential exposure conditions by various pathways, it is concluded that the material now present at the West Lake Landfill does not represent a radiological hazard by any pathway yet identified. Based on studies of the use of uranium tailings for backfill and leveling under and around residence foundations in Colorado, it is estimated that increased indoor radon and radon progeny concentrations could be experienced in structures built directly in or on the disposed tailings. An environmental impact analysis is required for an accurate estimate of the hazard potential for this pathway.

Attachments:
1.  Attachments A, B, C and D
2.  Exhibits A-E
3.  References 1-4

## ATTACHMENT A

During a survey performed by this office on August 11, 1976, to determine the effectiveness of Cotter Corporation's decommissioning of their Hazelwood, Missouri (Latty Avenue) site, a difference in the radiation readings supplied by Cotter and those found by this office was noted.

On May 10, 1974, Cotter reported exposure rates which ranged from 0.01 to 0.4 mR/hr measured at three feet above grade (type of instrument unknown). (Reference 1) These values were the basis for termination of the license by the Directorate of Licensing. (Reference 2) The Region III August 11, 1976 survey, made at the same distance, yielded readings ranging from 0.3 to 0.8 mrad/hr beta-gamma. (Reference 3) Additionally, a survey at one centimeter revealed two areas reading 1.2 and 1.8 mrad/hr beta-gamma. The instrument used by IE:III inspectors in performing these measurements was an Eberline E-500B with an end-window Model HP-190 Hand Probe $(1.4-2 \text{ mg/cm}^2)$.

The presently acceptable limit for release of ground areas, as implied in the "Decontamination Guide" (Reference 4) is 0.4 mrad/hr, total, or 0.2 mrad/hr, average, with a maximum of 1.0 mrad/hr, all of which are to be measured at 1 cm with a probe of not more than 7 mg/cm$^2$ of total adsorber. Thus, the NRC Region III survey of August 11, 1976 showed radiation levels at the Latty Avenue site exceeding the acceptable release limits, while the survey performed by Cotter Corporation showed levels within the guidelines. Both surveys indicate a low, non-hazardous radiation level. The difference in results might be attributable to differences in instruments and procedures used. The August 11, 1976 surveys were the first independent examination by NRC of radiation levels at the Latty Avenue site.

ATTACHMENT B

ENVIRONMENTAL SAMPLE
Analytical Results by HSL

Results (uCi/g)

| Sample No. | Sample Description | Natural Uranium | Ra-226 |
|---|---|---|---|
| L-1 | Soil | 1.2 + 0.1 E-4 | 1.4 + 0.03 E-3 |
| L-2 | Soil | 7.5 + 0.1 E-5 | 5.14 + 0.14 E-4 |
| L-3 | Vegetation | 2.6 + 0.2 E-5 | -- |
| L-4 | Wet Sediment From Cold Water Creek | 5.3 + 0.4 E-6 | -- |
| W-1 | Soil | 5 + 2 E-7 | -- |
| W-2 | Soil | 5.3 + 0.4 E-6 | -- |

Note: 1) L-1 through L-4 collected at Latty Avenue Site
      2) W-1, W-2 collected at West Lake Landfill
      3) L-3 vegetation dried, analyzed dry, reported as wet weight
      4) L-4 dried prior to analysis
      5) A systemic error of + 20% should be assigned to Ra-226 analysis
         due to uncertainty of the equilibrium between Rn-222 and Rn-226.
         An 80% equilibrium ratio was assumed.

ATTACHMENT C
Rn-222 Emanation Calculations

1. **Rn-222 at the Spoils/Cover Interface**

Total release = (area) x (source flux)          Kraner, et al, the Natural
             = (1600 m$^2$) x DC$_o$ $(\lambda/(DS))^{\frac{1}{2}}$   Radiation Environment, 1964

**Assume:**

$D = 1.5 \times 10^{-2}$ cm$^2$/sec          $1 \times 10^{-1}$ = 10% "emanation power"
(fraction escaping solid soil gas)
$C_o = (1.0$ nCi/g$)(1.6$ g/cm$^3)(1 \times 10^{-1})$   Tanner, The Natural Radiation
       = 0.16 nCi/cm$^3$ = 160 pCi/cm$^3$   Environment, 1964

$\lambda = 2.099 \times 10^{-6}$ sec$^{-1}$

$S = 0.25$                                    0.25 = soil "void fraction"

Total release = $(1.6 \times 10^7)(1.5 \times 10^{-2})(160)(2.099 \times 10^{-6}/(1.5 \times 10^{-2}/0.25))^{\frac{1}{2}}$
             = $(3.84 \times 10^7)(3.5 \times 10^{-5})^{\frac{1}{2}}$

Total release = $2.3 \times 10^5$ pCi/sec    over $1.6 \times 10^7$ cm$^2$

 area release = $1.44 \times 10^{-2}$ pCi/cm$^2$ . sec

2. **Rn-222 at the Surface of the Cover**

$C_2 = C_1$ exp $(-Z(\lambda/D)^{\frac{1}{2}})$          Tanner, The Natural Radiation
                                              Environment, 1964

**Assume:**

$C_1 = 1.44 \times 10^{-2}$ pCi/cm$^2$ . sec

$D = 1.5 \times 10^{-2}$ cm$^2$/sec

$\lambda = 2.099 \times 10^{-6}$ sec$^{-1}$

$Z = 100$ cm

$C_2 = (1.44 \times 10^{-2})$ exp $(-100 (2.099 \times 10^{-6}/1.5 \times 10^{-2})^{\frac{1}{2}})$

    = $(1.44 \times 10^{-2})$ exp $(-1.18)$

    = $(1.44 \times 10^{-2}) (0.31)$

$C_2 = 4.4 \times 10^{-3}$ pCi/cm$^2$ . sec

**Entire area:** $(4.4 \times 10^{-3}) (1.6 \times 10^7) = 7.0 \times 10^4$ pCi/sec

**Therefore,** the total emanation rate is about 70 nCi/sec, or about
0.1 µCi/sec.

- 2 -

3. **Atmospheric Dispersion Coefficient**

$X/Q = 1/\pi\sigma_y\sigma_z u$

$\sigma_y$ and $\sigma_z$ are calculated using the "virtual point source" method described in Workbook of <u>Atmospheric Dispersion Estimates</u>, as follows:

a.  for a square area with 40m sides, $\sigma_{yo} = S/4.3 = 40/4.3 = 9.3m$

b.  in the area, $\sigma_{yo} = \sigma_y = 9.3m$

c.  at 20m (center of area from side), stability class E, and ground-level release, $\sigma_z = 1m$

d.  assume annual avg. windspeed is 2 m/sec

$X/Q = 1/(3.14)(1)(9.3)(2) = 1.7 \times 10^{-2}$ sec/m$^3$

4. **Concentration in Air**

Concentration $= (0.1$ uCi/sec$)(1.7 \times 10^{-2}$ sec/m$^3) = 1.7 \times 10^{-3}$ uCi/m$^3$

## SUPPLEMENTAL REPORT

### INVESTIGATION FOR URANIUM/THORIUM

### COTTER CORPORATION, LATTY AVENUE SITE, ST. LOUIS, MISSOURI

### OCTOBER 20, 1976

Pursuant to the ongoing investigation of possible uranium/thorium contamination at the Latty Avenue site, Messrs. J. A. Pagliaro and G. T. Gibson performed a site inspection on October 20, 1976. The purpose of this inspection was to identify the property owner from county tax records, to survey the property with beta-gamma and alpha survey instrumentation, and to obtain selected soil and vegetation samples for laboratory analyses.

The records reviewed at the St. Louis County Building, 41 South Central, St. Louis, Missouri, were the current county property tax rolls. County personnel stated the tax records examined were dated as of July 1976. The record indicated the following:

>       Address:    9200 Latty Avenue
>
>       Owner:      Commercial Discount Corporation
>                   55 East Monroe Street
>                   Chicago, Illinois  60603
>
>       Size:       3.5 acres

Telephone communication with IE:III was performed to ascertain whether the property had since been transferred. Additional information was received which indicated Commercial Discount Corporation had transferred ownership of the property in August 1976 to the Bayless Company, 175 Outer Road West, Valley Park, Missouri.

A site investigation was then performed and samples were obtained. Figure 1 indicates the relative position of various buildings, landmarks, and locations of collected samples. The area in Figure 1 encompassing the abandoned garage, abandoned warehouse building, and the abandoned and boarded-up burned building was estimated to be approximately three (3) acres. The entire area, including the warehouse area and plowed field, was estimated to be in excess of six (6) acres.

ATTACHMENT D

- 2 -

A survey of the plowed field utilizing the beta-gamma instruments indicated only background activity (<0.1 mR/hr), except for several small yellow-colored chunks of surface material. The location of the "yellow surface" material is shown in Figure 1. The "yellow surface" chunks ranged in size from 4 x 4 x 1 inches to small flakes. The material was somewhat fiberous in texture. The "yellow surface" material had an apparent beta-gamma flux of 10 mR/hr at contact. Approximately 1.5 pounds of the "yellow surface" was collected for laboratory analysis. Several holes were dug to a depth of 15 inches but no subsurface yellow material was excavated.

Selected soybeans were collected from the plowed field, within ten feet of the "yellow surface" material. Approximately 1/4 pound of soybeans were collected for laboratory analysis. A background control soybean sample was obtained later, a distance of 7 miles from Latty Avenue.

A rusting abandoned hopper, shown in Figure 1, was surveyed for beta-gamma and alpha activities. Survey results showed no significant activity above background (< .1 mR/hr beta-gamma, 500 DPM alpha).

The warehouse building was surveyed with beta-gamma and alpha instruments. The floor of the warehouse was composed of dirt and broken concrete. Several elevated readings above background activity were recorded. The highest apparent location was in the center of the warehouse, beside a support column. Readings of up to 0.8 mR/hr beta-gamma and 30,000 DPM alpha were observed. A "warehouse dirt" sample, consisting of approximately 2 pounds of topsoil was obtained for laboratory analysis.

Preliminary radiological analyses were performed at IE:III using beta-gamma, alpha, and gamma-spectroscopy instrumentation. The samples were then forwarded to ERDA:Health Services Laboratory (HSL), Idaho Falls, Idaho.

The results of the IE:III analyses showed no detectable activity in either soybean sample. The "yellow surface" sample showed 10 mR/hr beta-gamma and 4,000 DPM alpha at contact with a few grams of material. Gamma scanning with an unshielded NaI crystal indicated the presence of uranium isotopes but not thorium and thorium daughters. The "warehouse dirt" sample showed 0.3 mR/hr beta-gamma and 26,000 DPM alpha at contact with a sample of about 250 g. Gamma scanning with NaI indicated both uranium and thorium and their decay chain products to be present.

- 3 -

The results of alpha spectroscopic analyses of the two soil samples by HSL are presented in Table I below. HSL analyses of the two soybean samples showed only small quantities of naturally-occurring K-40.

## TABLE I

| Sample | Radionuclide | Alpha Spectroscopic Concentration (uCi/g) | | |
|--------|--------------|------|------|------|
| Warehouse Dirt | Th-230 | 3.61 | ± 0.05 | E-02 |
|  | Th-227 | 4.4 | ± 0.2 | E-04 |
|  | U-238 | 6.64 | ± 0.06 | E-04 |
|  | U-234 | 6.52 | ± 0.06 | E-04 |
|  | U-235 | 3.09 | ± 0.07 | E-05 |
|  | Ra-226 | 5.2 | ± 0.1 | E-04 |
| Yellow Material | U-238 | 0.3 | ± 0.1 | |
|  | U-234 | 0.3 | ± 0.1 | |
|  | U-235 | 0.3 | ± 0.1 | E-02 |



FIGURE 1

Locations of sampling and surveys – 9200 Latty Ave., October 20, 1976

CHRISTOPHER S. BOND
GOVERNOR



JAMES L. WILSON
DIRECTOR

# missouri department of natural resources

P. O. Box 1368    Jefferson City, Missouri 65101    314/751-2815

June 2, 1976

Mr. James G. Keppler
Regional Director
U.S. Nuclear Regulatory Commission
799 Roosevelt Road
Glen Ellyn, IL  60137

Dear Mr. Keppler:

In articles published May 30 and June 1 (copies enclosed) St. Louis
Post-Dispatch reporter Margaret W. Freivogel presented evidence that
some seven tons of uranium were dumped in 1973 at the West Lake Land-
fill in St. Louis County by an Atomic Energy Commission subcontractor
removing radioactive waste material from a site in Hazelwood, Missouri.
The area was closed as an industrial and sanitary landfill by this
Department in 1974 (a new sanitary landfill in an adjacent area pro-
tected from groundwater contact now operates under DNR permit). The
closed area where the dumping allegedly occurred may be in direct
contact with groundwater. It has no monitoring wells to permit
evaluation of groundwater contamination.

In your letter to me of February 19, 1976 you stated that "a review by
the then AEC showed there was no significant health or environmental
hazard associated with the burial". The letter to Cotter Corporation
from John G. Davis you enclosed stated, "It is our understanding from
your contractor that the material was then deposited under about
100 feet of refuse and earth at St. Louis County sanitary landfill
No. 1." The investigation by the Post-Dispatch indicates that AEC did
not know the correct location of the dumping, the local geology, nor
the actual concentration of uranium dumped. The depth cited must
also be incorrect since no landfills in the St. Louis area contain
100 feet of fill. I must therefore question the validity of the AEC
"review" of the burial operation.

I respectfully request that in view of the concerns of this Department
and the people of the St. Louis area, that the Nuclear Regulatory
Commission takes steps to:

1.  Provide me with all documents which might assist me in verifying
    the Post-Dispatch report, and in establishing the exact amount
    and chemical form of radioactive materials allegedly dumped at
    West Lake.

Exhibit A
1 of 4

Mr. Keppler
Page 2
June 2, 1976

2. Require the Energy Research and Development Administration,
   as successor to AEC's source material operations, to

   a) Include the West Lake Landfill in the areas it has selected
      for intensive aerial and ground level radiation monitoring.

   b) Locate the uranium precisely within the landfill, both as
      to position and depth.

   c) Install appropriate groundwater monitoring wells and implement
      a monitoring program to determine the extent, if any, of
      groundwater contamination.

   d) Recommend actions to be taken to protect landfill workers
      and the public from any potential hazards associated with
      this material.

3. a) Advise me on who would be liable in the event that cleanup
      costs are involved.

   b) Ascertain whether federal laws or regulations were violated
      by either the Atomic Energy Commission or its subcontractor
      in the disposal of source material at an unlicensed site.

In a related matter, I was disappointed to learn that you do not maintain
records of radioactive waste burials carried out by licensees under
authority of Section 20.304 of Title 10 CFR. I hereby respectfully
request that your office obtain such records from all Missouri licensees
who have made such burials and make these records available to me.

Sincerely,

Kenneth M. Karch
Director
Division of Environmental Quality

KMK:JE:jhb
cc: Robert J. Koke, EPA Region VII
Enclosure

Exhibit A
2 of 4

Case: 4:22-cv-00292-MTS Doc. #: 80-2 Filed: 05/12/23 Page: 25 of 54 PageID #: 640

# f Radioactive Wastes In County

Ispatch
I nearly
is said,
much."
ted as
commis-
ctor in
d been
o that in
s clearly

Inaccur-
al Nucle-
aid this
te posed
regulato-
Atomic
track of

In addition to being wrong about the volume of the waste, federal records are wrong also about its location. The AEC report said the material had been deposited at "St. Louis County Landfill No. 1 on Old Bridge Road." No such place exists.

The B & K vice president, Davis, confirmed that the material had gone to the West Lake Landfill on St. Charles Rock Road. St. Louis County Landfill No. 1 is on Dorsett and Adie Roads, more than four miles away.

The West Lake Landfill was closed temporarily in 1971 for improvements because state officials found that certain pollutants were leaking from it into the surrounding flood plain soil. No test for radioactivity was made because officials

were unaware that any radioactive materials were in the landfill.

Before the improvements were made, it would have been "irresponsible" to put any hazardous waste at West Lake, said Joseph Eigner, who runs the Missouri hazardous waste program.

The problem at West Lake may have been compounded by using the radioactive material as a daily cover for trash, Eigner said. That would subject the waste to rainwater and the possibility of runoff.

State officials said the radioactive waste posed no immediate health hazard because it was relatively weak and would be extremely diluted by the Missouri River water even if it were to reach the river. There is no evidence

that the radioactive waste did reach the river.

The waste material, according to AEC records, consisted of seven tons of natural uranium mixed with about 8,700 tons of barium sulfate, a powdery white substance. This waste and other waste products were generated at a nuclear processing plant, now closed, that Mallinckrodt Inc. operated on Destrehan Street, on St. Louis's near North Side.

The barium sulfate and other waste products originally were stored at Lambert Field. Later, some of them were moved to a site at 9200 Latty Road, Hazelwood, in preparation for reprocess-

See DUMPING, Page 4

tying
or it's
d.
rtant
more
hat is
cent

y the
ncen-
1 per
later
had a
use it
either
duced
it sat

ed to
cent,"
in the
over
d then
was in
move it
to and

samples of the truckloads being sent to the landfill, but he acknowledged that they, too, could have been inaccurate.

Federal authorities made no independent measurements of the strength of material and normally do not in a case like this, a spokesman for the Nuclear Regulatory Commission said. Relying on Cotter's records, a federal inspector concluded that the concentration of uranium in the material being dumped was .0031 per cent—well below the .05 per cent limit set in the regulations.

A St. Louis environmental engineering firm, Dychman, Edgerley, Tomlinson and Associates, had been hired to monitor radiation levels at the site. But it also made no independent tests of the truckloads being sent to the landfill said Phillip Feeney, who worked on the project.

To reduce allegations that it has closely watched by his company, the engineering firm and the AEC, none of the three actually saw or tested the material being sent to the landfill.

the Hazelwood site for radiation and found it clean.

AEC investigators did find fault with one aspect of the waste disposal. The agency reprimanded Cotter Corp. in a letter for diluting the waste with the 39,000 tons of soil—ironically, the practice that apparently did not occur.

Federal regulations prohibit the dilution of radioactive material to reduce the concentration so that the material will fall outside the .05 per cent limit set for more stringent handling of the waste, the letter said.



RADIOACTIVE WASTE storage areas. Map indicates where the barium sulfate was originally stored, the site at 9200 Latty Road, and where it was moved, the West Lake Landfill at St.

# Radioactive Materials Checks Called Faulty

By MARGARET W. FREIVOGEL
Of the Post-Dispatch Staff

No one adequately monitors radioactive materials in Missouri and the state is unprepared to handle accidental releases of radiation, two state officials familiar with the situation say.

The dumping of several thousand tons of low-level radioactive waste at the West Lake Landfill in St. Louis County, disclosed Sunday in the Post-Dispatch — is only one of several nuclear-related problems, said Kenneth M. Karch and Marcian Nodiff.

Karch is director of environmental quality for the state Department of Natural Resources; Nodiff is the department's director of planning and policy development.

There is no evidence that the West Lake dumping caused a health hazard, but it apparently confused federal authorities who were supposed to be keeping track of the material.

False business records of the transaction caused federal officials to have incorrect records of the strength, volume and location of the material the Post-Dispatch found.

"I'm one of the Atomic Energy Commission's most outspoken critics," said David P. Marcott, executive vice president of Cotter Corp., which had purchased the waste material to extract valuable ores it contained.

"Ninety-nine per cent of the time they (federal authorities) don't know what's going on even when they have someone standing there.

"As a citizen and as a member of this industry, I'd like to see them do a better job," Marcott said.

Nodiff and Karch said they were disturbed by the West Farms incident because it was, in their opinion, indicative of serious gaps that exist in the monitoring of low-level waste.

The federal Nuclear Regulatory Commission, which replaced the now-defunct Atomic Energy Commission is too shorthanded to investigate comprehensively, the officials said. State officials have no authority to fill in for the federal agency, they said.

They listed several problems, including:

(1) Inadequate monitoring of a disposal site at Sinclair Farms near Columbia, Mo., where low-level radioactive waste is buried in plastic bags.

(2) Inadequate preparations for possible accidents at two nuclear power plants situated near enough to Missouri to cause injury in the state and from Union Electric Company's Callaway County plant, now under construction.

(3) Inadequate attention to the transportation of radioactive materials through the state. Tri-State Motor Co., the largest transporter of nuclear materials in the nation is based in Joplin, Mo. However, most of its cargo does not pass through Missouri, a study by the Department of Natural Resources found.

Karch and Nodiff failed to convince the

Legislature to enact a radiation protection act during the last session. It would have empowered state officials to monitor more effectively waste disposal and transportation. The state officials plan to urge enactment of the legislation again next session.

"The federal agencies just aren't manned to do a thorough and comprehensive job," Nodiff said. "They're forced to set priorities on what they inspect. They start with Mallinckrodt (which manufactures large amounts of radiopharmaceuticals), and they're taking care of that. But when you get down to the bottom of the list they might be hitting someone only once every 20 years."

A federal atomic safety official said he thought the monitoring program was comprehensive enough.

"It's disturbing that we might have got incorrect information (about the West Lake disposal)," said James Allen, chief of the fuel facility and material safety branch at the Nuclear Regulatory Commission's regional office in Glen Ellyn, Ill. "But when there's no health hazard involved in a situation, strict monitoring of it would be taking people away from more important health issues."

Allen said he was not concerned about the agency being duped. The West Lake episode was an isolated incident, he said.

In that case, B&K Construction Co., Inc. apparently submitted false invoices for Cotter Corp. showing that it had moved nearly 40,000

tons of waste and soil in 197_ to one site situated at St. Charles Rock Road and Taussig Road.

In fact, a B&K officer admitted recently the firm actually had moved less than 9000. Relying on the incorrect invoices, an atomic safety inspector concluded that the waste been diluted with soil to reduce its radioactivity.

Consequently, the inspector's report was written on the strength, volume and location of waste. Despite the errors, federal and state officials said the material posed no health hazard.

Safety chief Allen added that he was worried about the waste burial site at Sinclair Farms near Columbia, Mo. The site was established in 197_ to save the cost of shipping the low-level waste material to a federal disposal area in Sheffield, Ill.

Allen said the material, originating from research projects at the University of Missouri, was very low in radioactivity and its burial governed by federal regulations.

But Karch said he was disturbed that Sinclair Farms had not been put under greater state authority. He was concerned that federal officials relied too heavily on the owner instead of independent experts to keep track of activities there.

The Nuclear Regulatory Commission based its determination on information supplied by the site operator.

UNITED STATES

**NUCLEAR REGULATORY COMMISSION**

REGION III

799 ROOSEVELT ROAD

GLEN ELLYN, ILLINOIS 60137

JUN 1 7 1976

Mr. Kenneth M. Karch                    License No. SUB-1022
Director, Division of
  Environmental Quality
Missouri Department of
  Natural Resources
P. O. Box 1368
Jefferson City, Missouri    65101

Dear Mr. Karch:

This is in response to your letter dated June 2, 1976, requesting
additional information and follow-up action relative to the
burial of some seven tons of natural uranium in a St. Louis County
landfill in 1973.

The information published in the St. Louis Post-Dispatch on
May 30 and June 1, 1976, which was enclosed with your letter
of June 2, 1976, is new to this Office and, as you pointed out,
conflicts with the information obtained by our inspectors in
1974. Based on this apparent discrepancy, the NRC plans to
initiate a full investigation into this matter during the week
beginning June 20, 1976. The findings from this investigation,
which will be made available to you, will determine the need
for further NRC action. At the conclusion of the investigation,
all documents relative to this burial will be provided to your
Office.

With respect to your June 2, 1976 letter, I would like to
clarify one apparent misconception at this time. The Cotter
Corporation, which was responsible for this burial, was an
AEC licensee ── not an AEC subcontractor. Consequently, the
Energy Research and Development Administration has no
responsibility with regard to this material. As a former
licensee, the NRC will look to Cotter Corporation to correct
any safety or environmental related problems identified
through our investigation.

Regarding your other request that this office obtain from
materials licensees in the State of Missouri records of low
level radioactive waste burials under 10 CFR 20.304, I must
reiterate that there is no NRC regulation that requires
reporting waste burials under 20.304. Therefore, there is no



Mr. Kenneth M. Karch          - 2 -          JUN 1 7 1976

basis for such a request to the licensees. If you believe
that the NRC's current regulations concerning such burials
are inadequate, you may petition the NRC for consideration of
a change of the regulations. This rulemaking petition should
be submitted under the provisions of 10 CFR 2.802, a copy of
which is enclosed.

If you have any questions concerning the above, please let me
know.

                              Sincerely yours,



                              James G. Keppler
                              Regional Director

Enclosure:
10 CFR 2.802

cc w/o encl, w/ltr dtd 6/2/76:
R. J. CokeEPA Region VII
M. W. Freivogel, St. Louis Post-Dispatch
D. P. Marcott, Cotter Corporation

bcc w/o encl, w/ltr dtd 6/2/76:
J. G. Davis, Deputy Director
D. Thompson, IE:HQ
L. Rouse, NMSS
S. Schwartz, SLR
J. Fouchard, PA
Central Files
IE Mail and File Unit
PDR
NSIC


                                        Exhibit B
                                        2 of 2

Telephone
HArrison 7-5666

**INVOICE**

# B. & K. Construction Company, Inc.

**GENERAL PAVING CONTRACTORS**

4140 Cypress Road, St. Ann, Missouri

"PAVE THE WAY WITH B & K"

№ 10353

Cutter Corporation
P.O. Box 751
Cannon City, Colorado 81212

• DRIVEWAYS
• STREETS
• SUBDIVISIONS
• FACTORY FLOORS
• PARKING LOTS

7/31/73

JOBSITE:  Latty Avenue, St Louis County

| | |
|---|---|
| Material trucked to disposal site | 4981.85 tons G$ |
| Material shipped by railroad | 2341.75 tons G$ |

THIS INVOICE IS DUE AND PAYABLE WITHIN 10 DAYS AS PER AGREEMENT.



RECEIVED

Exhibit C
1 of 11

**INVOICE**

Telephone
HArrison 7-5566

# B. & K. Construction Company, Inc.

GENERAL PAVING CONTRACTORS

4140 Cypress Road, St. Ann, Missouri

"PAVE THE WAY WITH B & K"

Nº 1038

Cotter Corporation
P.O. Box 751
Cannon City, Colorado 81212

• DRIVEWAYS
  • STREETS
    • SUBDIVISIONS
      • FACTORY FLOORS
        • PARKING LOTS

8/10/73

---

JOBSITE:  Latty Avenue, St. Louis County

Material trucked to disposal site Aug. 1st thru Aug. 9th -8373.75 tons

₢$

Material shipped by railroad Aug. 1st. thru Aug. 9th- 846.70 tons

₢$

8373.75 tons ₢$5.02 (scale charge)

( THIS INVOICE DUE AND PAYABLE WITHIN TEN (10) DAYS )

# 1319
2162

Exhibit C
2 of 11

AUG 21 1973

**· · INVOICE · ·**

on 7-5666

# B. & K. Construction Company, Inc.

GENERAL PAVING CONTRACTORS

4140 Cypress Road, St. Ann, Missouri

"PAVE THE EARTH WITH B & K"

N⁰ 1036

- DRIVEWAYS
- STREETS
- SUBDIVISIONS
- FACTORY FLOORS
- PARKING

Cotter Corporation
P.O. Box 751
Canon City, Colorado 81212

8/17/73

JOBSITE:   Latty Avenue - St. Louis County

August 10 through August 16:

   6,304.10 tons hauled to disposal area by truck @$

     486.95 tons shipped by rail @ $

   6,304.10 tons @ $     scale charge

$

THIS INVOICE DUE AND PAYABLE WITHIN TEN (10) days.

# 1314
21 62

Exhibit C
3 of 11

INVOICE

**Arrison 7-5666**

# B. & K. Construction Company, Inc.

GENERAL PAVING CONTRACTORS

4140 Cypress Road, St. Ann, Missouri

"PAVE THE WAY WITH B & K"

N° 1037

Cotter Corporation
P.O. Box 751
Cannon City, Colorado 81212

- DRIVEWAYS
  - STREETS
    - SUBDIVISIONS
      - FACTORY FLOORS
        - PARKING LOT

Approved _____ 8/24/73

JOBSITE: Latty Avenue

August 17 through August 23:

5,895.40 tosn hauled to disposal area by truck @ $

1,674.80 tons shipped by rail @ $

5,895.40 tons @ $   scale charge

OK
WG

THIS INVOICE DUE AND PAYABLE WITHIN TEN (10) DAYS.

KEY PUNCH

#1349  2102

Exhibit C
4 of 11

Telephone
HArrison 7-5666

**INVOICE**

## B. & K. Construction Company, Inc.

GENERAL PAVING CONTRACTORS

Osprey Road, St. Ann, Missouri

"PAVES THE WAY WITH B & K"

N°  1039

Cotter Corporation
P.O. Box 751
Cannon City, Colorado 81212

- DRIVEWAYS
- STREETS
- SUBDIVISIONS
- FACTORY FLOORS
- PARKING LOTS

8/31/73

JOBSITE:  Latty Avenue, St. Louis County

Material trucked to disposal site  6421.45 tons @ $
Material shipped by railroad       1231.10 tons @ $
6421.45 tons @ $.   (scale charge)

THIS INVOICE IS DUE AND PAYABLE WITHIN 10 DAYS

KEY PUNCH   # -1319
2162

Exhibit C
5 of 11

**INVOICE**   SEP 12 1973

Telephone
HArrison 7-5666

# B. & K. Construction Company, Inc.

PAVING CONTRACTORS

4011 Cypress Road, St. Ann, Missouri

N⁰ 1040 

"PAVE THE WAY WITH B-K"

Cotter Corporation
P.O. Box 751
Cannon City, Colorado 81212

- DRIVEWAYS
  - STREETS
  - SUBDIVISIONS
  - FACTORY FLOORS
  - PARKING LOTS

9/7/73

JOBSITE:  Latty Avenue - St. Louis County

August 31st through Sept. 6, 1973:

5,270.55 tons hauled to disposal area by truck @ $

1,174.95 tons shipped by rail @ $

5,270.55 tons @S.    scale charge

872.10 tons top soil hauled into site @ $

THIS INVOICE DUE AND PAYABLE WITHIN TEN (10) DAYS.

#1379

131

Exhibit C
6 of 11

Telephone
HArrison 7-5666

**INVOICE**

SEP 18 1973

# B. & K. Construction Company, Inc.

GENERAL PAVING CONTRACTOR

4140 Cypress Road, St. Ann, Missouri

"PAVE THE WAY WITH B & K"

N° 10405

Cotter Corporation
P.O. Box 751
Cannon City, Colorado 81212

• DRIVEWAYS
• STREETS
• SUBDIVISIONS
• FACTORY FLOORS
• PARKING LOTS

Approved _____ 9/24/73

---

JOBSITE: Latty Avenue - St. Louis County

September 7 through September 13, 1973:

4502.65 tons residue trucked to disposal area @$

1026.46 tons residue shipped by rail @$

4502.65 tons @$.    scale charge

THIS INVOICE DUE AND PAYABLE WITHIN TEN (10) DAYS    #1316

RECEIVED SEP 17 1973

KEY PUNCH

Exhibit C
7 of 11

Telephone
HArrison 7-5666

**INVOICE**

# B. & K. Construction Company, Inc.

GENERAL PAVING CONTRACTORS

4140 Cypress Road, St. Ann, Missouri

"PAVE THE WAY WITH B & K"

N° 1041

Cotter Corporation
P.O. Box 751
Cannon City, Colorado 81212

Location _____
Date Invoice Rec'd _____
Footings and Est. _____
Sales/Use Tax _____
Discount _____
A/C Dist. Made _____
Cost Sheet on Attached _____
Goods/Svc Rec'd _____
Prices Correct _____
Approved _____  9/21/73

• DRIVEWAYS
   • STREETS
      • SUBDIVISIONS
         • FACTORY FLOORS
            • PARKING LOTS

---

JOBSITE:  Latty Avenue - St Louis County

Sept. 14th through Sept. 20, 1973:

    1602.90 tons residue hauled to disposal area by truck @$

    1602.90 tons @$.    scale charge

    1335.65 tons shipped by rail @ $

    Dismantling dryer and loading on rail cars

    Labor working inside buildings on restoration

                                          #1316

THIS INVOICE DUE AND PAYABLE WITHIN TEN(10) DAYS.

Exhibit C
8 of 11

Telephone
HArrison 7-5666

**INVOICE**

OCT 4 1973

**B. & K. Construction Company, Inc.**

GENERAL PAVING CONTRACTORS

4140 Cypress Road, St. Ann, Missouri

N°. 10445

"PAVE THE B & K WAY"

Cotter Corporation
P.O. Box 751
Cannon City, Colorada 81212

- DRIVEWAYS
  - STREETS
    - SUBDIVISIONS
      - FACTORY FLOORS
        - PARKING LOTS

9/28/73

JOBSITE:  Latty Ave., St. Louis County

KEY PUNCH

Sept. 21 through Sept. 27, 1973:

2783.65 tons residue hauled by trucks @ $

2783.65 tons scale charge @ $

400.15 tons shipped by rail @ $

5390 tons soil trucked into jobsite @ $

Labor & equipment dismantling equipment and building
restoration

THIS INVOICE DUE AND PAYABLE WITHIN TEN (10) DAYS.

# 1316

RECEIVED OCT 1 1973

Exhibit C
9 of 11

Telephone
HArrison 7-5666

INVOICE                                    OCT 13 1973

# B. & K. Construction Company, Inc.

GENERAL PAVING CONTRACTORS

4140 Cypress Road, St. Ann, Missouri

"PAVE THE WAY WITH B & K"

N° 1045



• DRIVEWAYS
• STREETS
• SUBDIVISIONS
• FACTORY FLOORS
• PARKING LOTS

Cotter Corporation
P.O. Box 751
Cannon City, Colorado 81212

JOBSITE:  Latty Ave., St. Louis County

Sept. 28th thru Oct. 4th, 1973:

   1807.75 tons residue hauled to disposal area by truck @ $

   1807.75 tons @ $     scale charge

   244.90 tons shipped by rail @ $

   4491.00 tons top soil hauled onto jobsite @ $

KEY PUNCH          # 1316

RECEIVED OCT 11 1973

Exhibit C
10 of 11

**Telephone**
HArrison 7-5566

**INVOICE**

OCT 17 1973 

# B. & K. Construction Company, Inc.

GENERAL PAVING CONTRACTORS
4140 Cypress Road, St. Ann, Missouri

"PAVE THE WAY WITH B & K"

№ 1045

Cotter Corporation
P.O. Box 751
Canon City, Colorado 81212

- DRIVEWAYS
  - STREETS
    - SUBDIVISIONS
      - FACTORY FLOORS
        - PARKING LOTS

10/12/73

JOBSITE:  Latty Avenue, St. Louis County

KEY PUNCH

Oct. 5th thru Oct. 11, 1973:

600.65 tons residue hauled by truck from jobsite @ $

600.65 tons @ $    - scale charge

977 Hilift 5 days working inside building - grading,
    removing equipment, loading debris

2 Laborers 3 days

#1316
RECEIVED OCT 1973

Exhibit C
11 of 11

1216 Lackland Road
(314) 434-6960
Cable: RETA STL

# Ryckman/Edgerley/Tomlinson & Associates, Inc.



May 1, 1974
RETA-780

Mr. David P. Marcott
Executive Vice President
Cotter Corporation
Post Office Box 352
Golden, Colorado   80401

Dear Dave:

Attached are two (2) sketches of the Latty Avenue
Storage Site. The first depicts the original place-
ment of the residues and buildings. Building "D" was
the only building used for the actual drying opera-
tion.

The second sketch shows level of activity (MR/hr.) on
April 29, 1974, after decontamination had been com-
pleted. As you can see, all of the locations fall
below the allowable 0.6 MR/hr. (approximately 2,000
counts per minute) level.

If you have any questions or comments, or require
additional information, please contact me.

Very truly yours,

Phillip K. Feeney, P.E.
Associate

Enclosures

PKF:pac

Offices
McLean
Virginia
(Washington, D.
Dayton,
Ohio
Memphis,
Tennessee
Denver,
Colorado
Tampa,
Florida
New Orleans,
Louisiana
Arlington,
Texas
(Dallas-Ft. Wort
Houston,
Texas
Casper,
Wyoming
Chicago,
Illinois
Northumberland
England
Rome,
Italy

Exhibit D
1 of 3



A

B

Congo
Raffinate

C

D

Colorado
Raffinate

Settling
Ponds

Leached
Barium
Sulfate

RR SPUR

R E T A

Sketch not to scale

COTTER CORPORATION
LATTY AVENUE STORAGE SITE
HAZLEWOOD, MISSOURI

Exhibit D
2 of 3



RADIATION MONITORING SURVEY

Values of Gross Activity in MR/hr. at
approximately three feet above grade.

April 29, 1974

Sketch not to scale.

RETA

COTTER CORPORATION
LATTY AVENUE STORAGE SITE
HAZLEWOOD, MISSOURI

Exhibit D
3 of 3



UNITED STATES
ATOMIC ENERGY COMMISSION
WASHINGTON, D.C. 20545

NOV 1 1974

Cotter Corporation
ATTN: Mr. David P. Marcott
      Executive Vice President
P. O. Box 356
Golden, Colorado  80401

Gentlemen:

This refers to the inspection conducted by Mr. W. D. Grant of our
Region III Office on April 19 and 24, 1974, at your Hazelwood, Missouri
site and on April 25, 1974, at your Canon City, Colorado Office of
activities authorized by AEC Source Material License No. SUI-1020.
Reference is also made to the discussions of our findings with you by
Mr. Grant on April 26, 1974.

The inspection was an examination of the decommissioning operations at
the Hazelwood, Missouri site and consisted of interviews with personnel
of R-B Construction Company; consultants of uranium, Edison, Teridium,
and Associates; and, an examination of records at the Canon City, Colorado
Office.

The inspection findings showed that during the period of July - Oct
1973, about 8700 tons of leached barium sulfate containing about 8700
tons or averaging about 0.001 natural uranium was scooped up for disposal
with approximately 39,000 tons of soil, and the resulting uranium con-
centration was about .00001.  It is our understanding from your con-
tractor that the material was then deposited under about 100 feet of
refuse and earth at St. Louis, Missouri County sanitary landfill area
No. 1.

The disposal does not appear to be within the intent of the Commission's
regulation, 10 CFR Part 40, to allow alteration of the physical nature
of Source material (i.e. dilution of solids with nonradioactive source
material) in order to obtain a physical mixture which would no longer
be subjected to licensing by the Commission.

                                                        Exhibit E
                                                        1 of 2

Cotter Corporation                        -2-                    NOV 1  1974

We have been advised that the Directorate of Licensing is in receipt of
your request for license termination, which included the results of the
radiation surveys performed at the Hazelwood site. You will receive
separate correspondence concerning that request from the Directorate of
Licensing.

Sincerely,

John G. Davis, Deputy Director
  for Field Operations
Directorate of Regulatory Operations

Exhibit E
2 of 2

40 - 8035

LAW OFFICES

EDWARD J. McGRATH

201 NORTH FREDERICK AVENUE

GAITHERSBURG, MARYLAND 20760

(301) 948-2480

May 10, 1974

W. Burkhardt, Senior Chemical Engineer
Fuels Fabrication & Reprocessing Branch
Licensing, Regulatory
Room 435, East-West Towers
UNITED STATES ATOMIC ENERGY COMMISSION
Washington, D. C.  20545

    Re:  Cotter Corporation, Source Materials License No. SUB—1022

Dear Mr. Burkhardt:

    We enclose four copies of the Certification of Status with respect to the source
materials license of Cotter Corporation and constituting notification that the corpor-
ation no longer possesses any radioactive material subject to United States Atomic
Energy Commission licensing requirements.

    Submitted in connection with the certification is a letter from Phillip K. Feeney,
P.E., of the firm of Ryckman, Edgerley, Tomlinson & Associates, Inc., consulting
environmental engineers, to which are attached plats of the Latty Avenue storage site
where the licensed material formerly held by Cotter Corporation was deposited. The
plat which we have marked "Attachment A" indicates the locations of the buildings and
of the materials which were stored on the site. The plat which we have marked
"Attachment B" contains the results of a radiological survey conducted by Ryckman,
Edgerley, Tomlinson & Associates, Inc. subsequent to removal of all materials stored
on the sight.

    Based upon the work performed by Cotter Corporation, the work of contractors
hired by Cotter Corporation in connection with removal and cleanup, and upon the moni-
toring of Ryckman, Edgerley, Tomlinson & Associates, Inc., we are of the opinion that
the Latty Avenue storage site and all appurtenances have been decontaminated. Cotter
Corporation has removed to its mill in Colorado all materials with radioactivity
levels meeting or exceeding that which subjects holders to license requirements.

    Since all source materials now owned or held by Cotter Corporation are situated
in Colorado, and subject to the license issued to the corporation by the State of
Colorado, we request at this time that the United States Atomic Energy Commission
source materials license issued to Cotter Corporation be terminated.

    Please contact me should you wish further information.

                              Sincerely yours,

    Reference 1 (4 pages)

                              Edward J. McGrath
                              Attorney for Cotter Corporation

EJMcG/jmc
Copy to:  David P. Marcott
          Cotter Corporation

DOCKETED
USAEC

JUL 0 8 1974

REGULATORY
MAIL SECTION
DOCKET CLERK

CERTIFICATION OF STATUS OF SOURCE MATERIAL ACTIVITIES
UNITED STATES ATOMIC ENERGY COMMISSION

LICENSE NUMBER
SUB—1022

**LICENSEE:**   Cotter Corporation

**ADDRESS:**   P. O. Box 352, 11011 W. 6th Avenue, Suite 302, Lakewood, Colorado

**The** licensee and any individual executing this certification on behalf of
**the** licensee certify that (check appropriate item(s) below):

_____   No source materials have been procured and/or possessed by licensee.

__X__   All source materials procured and/or possessed by licensee under
Source Material License No.                    :

_____ (1) have or will be prior to expiration of the above license trans-
ferred to _____
(Institution, firm, hospital, person, etc.)

which has Source Material License No.

__X__ (2) have been or will be disposed of in compliance with 10 CFR 20
**prior to** expiration of this license.

Certifying Official
EDWARD J. McGRATH, Attorney for Cotter Corporation
**Date:**   May 9, 1974

**Please** return 4 copies to:
**U. S.** Atomic Energy Commission
**Materials** Branch, Directorate of
**Licensing**
**Washington, D. C.** 20545

# yckman/Edgerley/Tomlinson & Associates, Inc.

May 1, 1974
RETA-780

Mr. David P. Marcott
Executive Vice President
Cotter Corporation
Post Office Box 352
Golden, Colorado 80401

Dear Dave:

Attached are two (2) sketches of the Latty Avenue
Storage Site. The first depicts the original place-
ment of the residues and buildings. Building "D" was
the only building used for the actual drying opera-
tion.

The second sketch shows level of activity (MR/hr.) on
April 29, 1974, after decontamination had been com-
pleted. As you can see, all of the locations fall
below the allowable 0.6 MR/hr. (approximately 2,000
counts per minute) level.

If you have any questions or comments, or require
additional information, please contact me.

Very truly yours,

Phillip K. Feeney, P.E.
Associate

Enclosures

PKF:pac

Offices
McLean,
Virginia
(Washington, D.C.
Dayton,
Ohio
Memphis,
Tennessee
Denver,
Colorado
Tampa,
Florida
New Orleans,
Louisiana
Arlington,
Texas
(Dallas-Ft. Worth
Houston,
Texas
Casper,
Wyoming
Chicago,
Illinois
Northumberland,
England
Rome,
Italy

Case: 4:22-cv-00292-MTS   Doc. #: 80-2   Filed: 05/12/23   Page: 48 of 54 PageID #: 663



RADIATION MONITORING SURVEY

Values of Gross Activity in MR/hr. at
approximately three feet above grade.

April 29, 1974

RETA

Sketch not to scale.

COTTER CORPORATION
LATTY AVENUE STORAGE SITE
HAZLEWOOD, MISSOURI

NOV 1 3 1974

DISTRIBUTION:
PDR
LPDR
State Health Official
L:FM R/F
L:FFRB#1 R/F
LCRouse
WTCrow
HWerner
ACabell
BBrooks
RO:HQ (2)
LNUnderwood
RGPage

L:FFRB:WTC
40-8035
SUB-1022

Cotter Corporation
ATTN:  Mr. David P. Harcott
       Executive Vice President
P. O. Box 365
Golden, Colorado  80401

Gentlemen:

In accordance with your application dated May 10, 1974 and pursuant

to Title 10, Code of Federal Regulations, Part 40, Source Material

License No. SUB-1022, is hereby terminated.

                    FOR THE ATOMIC ENERGY COMMISSION

                         Original signed by
                         Leland C. Rouse

                    L. C. Rouse, Chief
                    Fuel Fabrication and Reprocessing
                      Branch No. 1
                    Directorate of Licensing

cc:  Law Offices
     Edward J. McGrath
     201 North Frederick Avenue
     Gaithersburg, Maryland  20760

Reference 2 (1 page)



Latty Avenue                                    8/11/76

A

E

C

P
0.8

0.3

0.3                    0.3

0.3

(1.8)
0.8

(1.2)
0.8

EMC Radiation Survey Measurements made at
approximately three feet above grade with
an EB rline ASO7 and H 19C Eual Probe.
Values shown are in mrad/hr and shown in mrem.
Late and max survey made. Other readings
Late and LISS at readings made.

( ) Measurements taken at 1 cm.

0.3

Railroad Spur

Cotter Corporation
Latty Avenue Storage Site
Hazelwood, Missouri

(Not to exact scale)

GUIDELINES FOR DECONTAMINATION OF FACILITIES AND EQUIPMENT

PRIOR TO RELEASE FOR UNRESTRICTED USE

OR TERMINATION OF LICENSES FOR BYPRODUCT, SOURCE, OR SPECIAL NUCLEAR MATERIAL

U. S. Atomic Energy Commission
Directorate of Licensing
Materials Branch
Washington, D.C.   20545

December, 1973

Reference 4 (4 pages)

The instructions in this guide in conjunction with Tables I and II specify the radioactivity and radiation exposure rate limits which should be used in accomplishing the decontamination and survey of surfaces of premises and equipment prior to abandonment or release for unrestricted use.  The limits in Tables I and II do not apply to premises, equipment, or scrap containing induced radioactivity for which the radiological considerations pertinent to their use may be different.  The release of such facilities or items from regulatory control will be considered on a case-by-case basis.

1. The licensee shall make a reasonable effort to eliminate residual contamination.

2. Radioactivity on equipment or surfaces shall not be covered by paint, plating, or other covering material unless contamination levels, as determined by a survey and documented, are below the limits specified in Tables I or II prior to applying the covering.  A reasonable effort must be made to minimize the contamination prior to use of any covering.

3. The radioactivity on the interior surfaces of pipes, drain lines, or ductwork shall be determined by making measurements at all traps, and other appropriate access points, provided that contamination at these locations is likely to be representative of contamination on the interior of the pipes, drain lines, or ductwork.  Surfaces of premises, equipment, or scrap which are likely to be contaminated but are of such size, construction, or location as to make the surface inaccessible for purposes of measurement shall be presumed to be contaminated in excess of the limits.

4. Upon request, the Commission may authorize a licensee to relinquish possession or control of premises, equipment, or scrap having surfaces contaminated with materials in excess of the limits specified.  This may include, but would not be limited to, special circumstances such as razing of buildings, transfer of premises to another organization continuing work with radioactive materials, or conversion of facilities to a long-term storage or standby status.  Such requests must:

    a. Provide detailed, specific information describing the premises, equipment or scrap, radioactive contaminants, and the nature, extent, and degree of residual surface contamination.

    b. Provide a detailed health and safety analysis which reflects that the residual amounts of materials on surface areas, together with other considerations such as prospective use of the premises, equipment or scrap, are unlikely to result in an unreasonable risk to the health and safety of the public.

- 2 -

5.  Prior to release of premises for unrestricted use, the licensee shall
    make a comprehensive radiation survey which establishes that contam-
    ination is within the limits specified in Tables I or II.  A copy of
    the survey report shall be filed with the Director, Materials Branch,
    Directorate of Licensing, USAEC, Washington, D.C.  20545, and also
    the Director of the Regional Office of the Directorate of Regulatory
    Operations, USAEC, having jurisdiction.  The report should be filed
    at least 30 days prior to the planned date of abandonment.  The
    survey report shall:

    a.  Identify the premises.

    b.  Show that reasonable effort has been made to eliminate residual
        contamination.

    c.  Describe the scope of the survey and general procedures followed.

    d.  State the findings of the survey in units specified in the
        instruction.

Following review of the report, the AEC will consider visiting the
facilities to confirm the survey.

## SURFACE CONTAMINATION LEVELS[1]

| ISOTOPE[2] | TABLE I TOTAL[3] | REMOVABLE[3][4] | TABLE II TOTAL[3] | REMOVABLE[3][4] |
|---|---|---|---|---|
| U-nat, U-235, U-238, Th-nat, Th-232, and associated decay products | 10,000 dpm α/100 cm² | 1,000 dpm α/100 cm² | Average[6] 5,000 dpm α/100 cm²  Maximum 25,000 dpm α/100 cm² | 1,000 dpm α/100 cm² |
| Other isotopes which decay by alpha emission or by spontaneous fission | 1,000 dpm α/100 cm² | 100 dpm α/100 cm² | Average[6] 500 dpm α/100 cm²  Maximum 2,500 dpm α/100 cm² | 100 dpm α/100 cm² |
| Beta-gamma emitters (isotopes with decay modes other than alpha emission or spontaneous fission) | 0.4 mrad/hr at 1 cm[5] | 1,000 dpm β-γ/100 cm² | Average[6] 0.2 mrad/hr at 1 cm[5]  Maximum 1.0 mrad/hr at 1 cm[5] | 1,000 dpm β-γ/100 cm² |

---

(1) Either Table I or Table II may be used. For example, if all beta-gamma readings were less than 0.4 mrad/hr at 1 cm, Table I could be used; but if the maximum reading were 0.8 mrad/hr, material could be released under Table II providing the average was less than 0.2 mrad/hr.

(2) Where surface contamination by both alpha and beta-gamma emitting isotopes exists, the limits established for alpha and beta-gamma emitting isotopes shall apply independently.

(3) As used in this table, dpm (disintegrations per minute) means the rate of emission by radioactive material as determined by correcting the counts per minute observed by an appropriate detector and count rate meter for background, efficiency, and geometric factors associated with the instrumentation.

(4) The amount of removable radioactive material per 100 cm² of surface area shall be determined by wiping that area with dry filter or soft absorbent paper and with the application of moderate pressure, and assessing the amount of radioactive material on the wipe with an appropriate instrument of known efficiency. In determining removable contamination on objects of lesser surface area, the pertinent levels shall be reduced proportionally, and the entire surface shall be wiped.

(5) Measured through not more than 7 milligrams per square centimeter of total absorber.

(5) Measurements of total contaminant shall not be averaged over more than 10 square meters. For objects of lesser surface area, the average shall be derived for each such object.