**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| NIKKI STEINER MAZZOCCHIO and ANGELA STEINER KRAUS, | |
| Plaintiffs, | |
| v. | Case No. 4:22-cv-00292-MTS |
| COTTER CORPORATION (N.S.L.), et al., | |
| Defendants. | |
| COTTER CORPORATION (N.S.L.), | |
| Third-Party Plaintiff, | |
| v. | |
| MALLINCKRODT LLC, EVERZINC USA INC., and CITICORP DEL-LEASE, INC., | |
| Third-Party Defendants. | |

**COTTER CORPORATION (N.S.L.)'S**
**THIRD-PARTY COMPLAINT AND CROSSCLAIMS**

Defendant / Third-Party Plaintiff Cotter Corporation (N.S.L.) ("Cotter") brings this Third-Party Complaint against Third-Party Defendants Mallinckrodt LLC ("Mallinckrodt"), EverZinc USA Inc. ("EverZinc"), and Citicorp Del-Lease, Inc. ("Citi"), and Crossclaims against Defendants DJR Holdings, Inc. ("DJR") and City of St. Louis.

**INTRODUCTION**

1.      This is a public liability action under the Price-Anderson Act, 42 U.S.C. § 2210, *et seq.*, because Plaintiffs allege damages arising out of or resulting from radioactive, toxic, or other hazardous properties of material containing uranium and/or thorium from Manhattan

Project nuclear materials, which comprises source material under 42 U.S.C. § 2210(q) (hereinafter, "the material").

2.      Mallinckrodt first produced the material under contracts with the United States that ultimately were merged under Atomic Energy Commission ("AEC") Contract No. W-14-108-Eng-8 ("the Contract").  The AEC later amended the Contract to include a Price-Anderson Act indemnification clause, in which the United States expressly agreed to indemnify Mallinckrodt and any "other persons indemnified" for public liability arising from, among other things, any nuclear incident involving the "material" produced or delivered under the Contract.

3.      Under the Price-Anderson Act and the Contract, public liability claims are litigated in federal court, and all resulting legal liability must be channeled to one source of funds (ultimately the United States) consistent with the indemnification.  The economic channeling stems from the Price-Anderson Act's broad definition of "person indemnified," which covers not only "the person with whom an indemnity agreement is executed," but also "any other person who may be liable for public liability."  42 U.S.C. § 2014(t).

4.      As broadly defined under the Price-Anderson Act, "other persons indemnified" include any "corporation" or "other entity."  42 U.S.C. § 2214(s).  "Public liability" means "any legal liability arising out of or resulting from a nuclear incident."  42 U.S.C. § 2214(w).  A "nuclear incident" involves "bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property" caused by "the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material."  42 U.S.C. § 2014(q). And a "public liability action" is "any suit asserting public liability."  42 U.S.C. § 2214(hh).

5.      Cotter, a corporation, which has been sued in this public liability action, is entitled to contribution and indemnification among the Defendants and Third-Party Defendants consistent with the Price-Anderson Act, the Contract, and if applicable, Missouri law.

**THE PARTIES**

6.      Cotter is a New Mexico corporation with its principal place of business in Colorado.

7.      Mallinckrodt is a Delaware limited liability company with its principal place of business in Missouri.  Mallinckrodt is the successor to Mallinckrodt Chemical Works and other predecessor entities.  Any liabilities of Mallinckrodt to Cotter in this case have not been discharged, released, enjoined, or otherwise impaired by Mallinckrodt's Plan of Reorganization under Chapter 11 of the Bankruptcy Code or Confirmation Order because any liabilities were asserted in writing before the Petition Date and are subject to current or future indemnification claims under its (or its predecessors') various contracts with the U.S. Army Corps of Engineers, as assumed by the AEC, a predecessor-in-interest to the U.S. Department of Energy, to support the production of refined uranium, including its production, storage, and disposal of radioactive material, consisting of source, special nuclear, and/or byproduct material, in the greater St. Louis, Missouri area.

8.      EverZinc is a New York corporation with its principal place of business in North Carolina.  EverZinc is the successor to African Metals Corporation and other predecessor entities.  Upon information and belief, African Metals Corporation was incorporated under New York law; African Metals Corporation changed its name to Afrimet-Indussa Inc.; Afrimet-Indussa Inc. changed its name to Sogem-Afrimet Inc.; Sogem-Afrimet Inc. changed its name to Sogem USA Inc.; Sogem USA Inc. changed its name to Umicore Marketing Services USA Inc.; and Umicore Marketing Services USA Inc. changed its name to EverZinc USA Inc.

9.      Citi is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York.  Citi is the successor to Commercial Discount Corporation ("Commercial Discount") and other predecessor entities.  Upon information and belief, on August 2, 1975, Associates First Capital Corporation acquired Commercial Discount in 1975 and operated Commercial Discount as a wholly owned subsidiary. Commercial Discount was a subsidiary of Associates First Capital Corporation, itself a subsidiary of Associates Corporation of North America, until on or about January 6, 1993, when Commercial Discount merged into Associates Fleet Leasing of Madison, Inc., and changed its name to Associates/Trans-National Leasing, Inc.  In November 2000, Citigroup Inc. completed its acquisition of Associates First Capital Corporation.  On or about December 19, 2007, Associates/Trans-National Leasing, Inc. was dissolved, and its assets were distributed to Citi. Citi has acknowledged in writing that Citi is the successor to Commercial Discount.

10.     DJR, formerly known as Futura Coatings, Inc., is a Missouri corporation with its principal place of business in Missouri.

11.     The City of St. Louis is a public entity organized and existing under Article 6, Section 31 of the Missouri Constitution, and operates the St. Louis Airport Authority as a department of the City of St. Louis.

## JURISDICTION AND VENUE

12.     This Court has original jurisdiction over the subject matter of this cause of action under 28 U.S.C. § 1331 and the Price-Anderson Act, 42 U.S.C. § 2210, *et seq*.

13.     This Court has personal jurisdiction over each of the Cross and Third-Party Defendants under Federal Rule Civil Procedure 4(k)(1) and the Price-Anderson Act, 42 U.S.C. § 2210(n)(2), as well as Missouri Revised Statutes § 506.500.1, because each has transacted

business and committed the alleged acts that form the basis of this cause of action within Missouri, so that each has purposely availed itself of Missouri law and could reasonably anticipate defending a lawsuit in Missouri.

14.     Venue is proper under 28 U.S.C. § 1391(b)(2) and the Price-Anderson Act, 42 U.S.C. § 2210, *et seq*., because a substantial part of the events or omissions giving rise to the claim occurred in this District, because the alleged nuclear incident occurred in this District, and because a substantial part of the property that is the subject of the action is situated in this District.

## FACTUAL ALLEGATIONS

### Plaintiffs' Common Allegations

15.     Plaintiffs Nikki Steiner Mazzocchio and Angela Steiner Kraus filed a complaint (including any current or future amendments), which contain common allegations against the Cross and Third-Party Defendants.  ECF 61.

16.     Plaintiffs allege personal injury arising out of alleged exposure to radioactive, toxic, or other hazardous properties of the material.

17.     Plaintiffs allege the Cross and Third-Party Defendants were in the alleged chain of commerce of the material, including allegedly using, handling, storing, or remediating the material, and thus owed a legal duty to Plaintiffs.

18.     Cotter incorporates its response to the complaint (including any current or future amendments) under Federal Rules of Civil Procedure 8(d)(2) and 10(c).

### Historical Allegations Against Cross and Third-Party Defendants

19.     The United States established the Manhattan Project during World War II to design and produce the world's first nuclear weapons.  In April 1942, at the initiation of Nobel Prize laureate and nuclear physicist Arthur H. Compton, Mallinckrodt entered into a letter

subcontract with the University of Chicago to research the production of purified uranium compounds, a key step to creating a self-sustaining nuclear reaction.

20.     As World War II extended, the United States awarded contracts directly to Mallinckrodt to produce and deliver production quantities of purified uranium.  The United States ultimately consolidated its uranium-production requirements under the Contract and assigned the AEC responsibility for administering the Contract.

21.     Mallinckrodt processed uranium under the Contract at facilities located in downtown St. Louis, Missouri, designated as the St. Louis Downtown Site.  These processing operations produced the material.  Mallinckrodt delivered the material to the United States, which owned and initially stored the material at the St. Louis Downtown Site.

22.     As focus shifted to the Cold War, the United States procured the use of a 21.7-acre property to store the material.  This site was designated as the St. Louis Airport Site because of its proximity to the St. Louis Municipal Airport.  The United States and Mallinckrodt transported much of the material from the St. Louis Downtown Site to the St. Louis Airport Site over the next decade, accumulating several thousand tons of the material at the St. Louis Airport Site by the late 1950s.

23.     In June 1960, the AEC issued a solicitation encouraging private companies to purchase the material stored at the St. Louis Airport Site.  The AEC marketed the opportunity by emphasizing that the "source material" could be processed to extract certain "contents of value," such as nickel, cobalt, copper, rare earth metals, and uranium.  The solicitation also promised that, after extracting the "contents of value," the buyer could dispose of any remaining material at a quarry site near a government-owned facility in Weldon Spring, Missouri.  The AEC received proposals from two private companies, but ultimately canceled the solicitation after the

United States Geological Survey raised concerns about possible contamination of the Missouri River from the quarry site.

24.     In March 1962, the AEC issued another invitation for private companies to bid on the material at the St. Louis Airport Site.  This time, the AEC received only one proposal and awarded a contract to the sole bidder, Contemporary Metals Corporation.  Before the sale could be completed, however, the United States terminated the contract for default because Contemporary Metals Corporation allegedly failed to meet its financial obligations under the agreement.

25.     In January 1964, amid pressure to accommodate plans for an airport expansion, the AEC again invited private companies to purchase the material at St. Louis Airport Site.  In this invitation to bid, the AEC highlighted that the "source material" contained "relatively large quantities of rare elements" and "one of the largest known amounts of concentrated scandium and ionium."  The AEC did not receive any proposals in response to the January 1964 solicitation.

26.     The AEC tried once more to sell the remaining material in an August 1964 invitation for bids, but that effort also failed to result in a contract award.

27.     In August 1965, the AEC formed a special committee to plan for the removal of the remaining material from the St. Louis Airport Site to a government-owned site in Weldon Spring, Missouri.  The committee ultimately concluded that the United States could save approximately $400,000 if the AEC continued efforts to sell the remaining material rather than remove it to Weldon Spring.

28.     Eventually, in February 1966, the AEC completed a "negotiated sale" of the remaining material at the St. Louis Airport Site to Continental Mining and Milling Company

("Continental Mining"), a subsidiary of the company that the United States had terminated for default in 1962.  In connection with this sale, the AEC issued Continental Mining a source material license to transfer the remaining material from the St. Louis Airport Site to a site on Latty Avenue in Hazelwood, Missouri ("the Latty Avenue Site").

29.     Cotter ultimately purchased some of the remaining material from Commercial Discount, the successor in title of the material, Continental Mining, at the Latty Avenue Site.  At various times between 1967 and 1969, some of the material was transported by others via rail from the Latty Avenue Site to a Cotter facility in Cañon City, Colorado.  In December 1969, Cotter acquired the material remaining at the Latty Avenue Site, which Cotter possessed under an AEC source material license.  Between 1970 and 1973, most of the material was transported by others via rail from the Latty Avenue Site to Cotter's facility in Cañon City, Colorado.

30.     Cotter and the AEC discussed where to dispose of the material remaining at the Latty Avenue Site.  The AEC initially authorized disposal at the government's facility in Weldon Spring but ultimately withdrew that option.  As a result, between July and October 1973, B&K Construction Company, Inc., transported remaining material, which was legally exempt under 10 C.F.R. § 40.13, titled "Unimportant quantities of source material," from the Latty Avenue Site to the West Lake Landfill in Bridgeton, Missouri.

31.     By the end of 1973, Cotter ceased operations at the Latty Avenue Site.  In 1974, Cotter requested that the AEC terminate Cotter's source material license and, after AEC inspection of the Latty Avenue Site, the AEC terminated Cotter's source material license under Title 10, Code of Federal Regulations, Part 40.

## Third-Party Allegations Against Mallinckrodt

32.     Beginning in World War II, and continuing thereafter, Mallinckrodt produced the material under the Contract.

8

33.     From 1942 through at least 1957, Mallinckrodt produced, used, handled, and stored the material at the St. Louis Downtown Site.

34.     From 1946 through at least 1957, Mallinckrodt and the United States transported much of the material from the St. Louis Downtown Site to the St. Louis Airport Site.

35.     From 1953 through at least 1966, Mallinckrodt operated the St. Louis Airport Site.

36.     From 1946 through at least 1966, Mallinckrodt had the material transported, used, handled, and stored at the St. Louis Airport Site.

37.     Mallinckrodt thus produced, delivered, used, handled, stored, and/or was otherwise in the chain of commerce of the material, and Plaintiffs have alleged personal injury and other damages as result of Mallinckrodt.

### Third-Party Allegations Against EverZinc

38.     In the 1940s, the United States purchased ores containing uranium from African Metals n/k/a EverZinc.

39.     African Metals n/k/a EverZinc owned, sold, and distributed the material that Mallinckrodt processed at the St. Louis Downtown Site.

40.     African Metals n/k/a EverZinc retained ownership of the material Mallinckrodt generated except for the uranium content.

41.     African Metals n/k/a EverZinc had the material transported, used, handled, and stored at the St. Louis Airport Site under lease agreements with the United States.

42.     Upon information and belief, in June 1959, African Metals n/k/a EverZinc abandoned and disposed of the material stored at the St. Louis Airport Site.

43.     Between approximately May 1966 and December 1966, some of the material that African Metals n/k/a EverZinc abandoned was transported by truck from the St. Louis Airport Site to the Latty Avenue Site.

44.     Between approximately July 1973 to October 1973, some of the material that African Metals n/k/a EverZinc abandoned was transported by truck from the Latty Avenue Site to the West Lake Landfill.

45.     African Metals n/k/a EverZinc thus delivered, used, handled, stored, and/or was otherwise in the chain of commerce of the material, and Plaintiffs have alleged personal injury and other damages as result of African Metals n/k/a EverZinc.

**Third-Party Allegations Against Citi**

46.     In February 1966, Continental Mining purchased the material stored at the St. Louis Airport Site.

47.     Commercial Discount n/k/a Citi financed the transactions and retained security interests in the material.

48.     In 1966, Continental Mining moved some of the material from the St. Louis Airport Site to the Latty Avenue Site.

49.     On or about December 14, 1966, Commercial Discount n/k/a Citi applied for a source material license from the AEC to take possession of the material stored at the Latty Avenue Site.

50.     On or about December 29, 1966, the AEC issued Source Material License No. SMC-907 to Commercial Discount n/k/a Citi to possess the material stored at the Latty Avenue Site.

51.     In January 1967, Commercial Discount n/k/a Citi took possession of the Latty Avenue Site and the material stored at the Latty Avenue Site.

10

52.     On or about February 3, 1967, Commercial Discount n/k/a Citi purchased the Latty Avenue Site and the material stored at the Latty Avenue Site at public auction.

53.     On or about February 22, 1967, Commercial Discount n/k/a Citi leased property adjoining the Latty Avenue Site for the purpose of handling the material stored at the Latty Avenue Site.

54.     In or about May 1967, Commercial Discount n/k/a Citi advised the AEC that Commercial Discount n/k/a Citi was selling the material stored at the Latty Avenue Site to Cotter.

55.     In or about June 1967, Commercial Discount n/k/a Citi and Cotter entered into a Residue Purchase Agreement ("1967 Agreement") related to the material stored at the Latty Avenue Site.  Under the 1967 Agreement, Commercial Discount n/k/a Citi owned the material stored at the Latty Avenue Site and had the obligation to deliver material to the designated point of delivery to Cotter in Cañon City, Colorado.

56.     On or about August 7, 1969, Commercial Discount n/k/a Citi and Cotter entered into another agreement ("1969 Agreement") related to the material stored at the Latty Avenue Site.  Under the 1969 Agreement, the Closing Date was December 29, 1969, and Commercial Discount n/k/a Citi was responsible for the equipment, material, and conditions at the Latty Avenue Site prior to the execution and closing of the 1969 Agreement.

57.     Commercial Discount n/k/a Citi thus delivered, used, handled, stored, and/or was otherwise in the chain of commerce of the material, and Plaintiffs have alleged personal injury and other damages as result of Commercial Discount n/k/a Citi.

## Allegations as to the Price-Anderson Act

58.    The Price-Anderson Act authorizes the United States to indemnify its nuclear-support contractors and any other "person indemnified" against third-party claims for "public liability" arising from a "nuclear incident."  42 U.S.C. § 2014(t).

59.    Amid the AEC's multiple failed efforts discussed above to market and sell the material to private companies in the early 1960s, the AEC and Mallinckrodt executed a bilateral modification to the Contract (Modification 124 (August 23, 1962)) to incorporate a Price-Anderson Act indemnification provision for the benefit of Mallinckrodt and "other persons indemnified" (the "Contract Indemnification Clause").

60.    In executing Modification 124, the AEC and Mallinckrodt expressed a common desire to adopt "provisions relative to the indemnification of the Contractor and others with respect to public liability resulting from certain nuclear incidents . . . ."  Modification No. 124 at 1.

61.    The AEC and Mallinckrodt also agreed that the Contract Indemnification Clause would apply the definitions stated in the Price-Anderson Act, *id.*, including its broad definition of "person indemnified," which covers "the person with whom an indemnity agreement is executed . . . and any other person who may be liable for public liability," 42 U.S.C. § 2014(t).

62.    The Contract Indemnification Clause includes any "other persons indemnified," as reflected in Section 3, Paragraph a:

> To the extent that the Contractor and any other persons indemnified are not compensated by any financial protection permitted or required by the Commission, the Commission will and does hereby indemnify the Contractor, and other persons indemnified, against (i) claims for public liability as described in Paragraph b. of this Section 3; and (ii) the reasonable costs of investigating and settling claims, and defending suits for damage for such public liability, provided that the Commission's liability under all indemnity agreements entered into by the Commission under Section 170 of the Act, including this contract, shall not exceed $500,000,000, including such reasonable costs, in the aggregate for each nuclear

incident irrespective of the number of persons indemnified in connection with this
contract

Modification No. 124 at 2.

63.     Section 3, Paragraph b of the Contract Indemnification Clause extends the United

States Government's indemnity obligations to public liability that "(i) arises out of or in

connection with the contractual activity" and "(ii) arises out of or results from," inter alia, "(4) a

nuclear incident which involves . . . material . . . produced or delivered under this contract." *Id.*

at 2–3.

64.     The Contract Indemnification Clause did not require Mallinckrodt to maintain

financial protection to cover public liability claims, stating:

> Except as hereafter permitted or required in writing by the Commission, the
> Contractor will not be required to provide or maintain, and will not provide or
> maintain at Government expense, any form of financial protection to cover public
> liability.  The Commission may at any time require in writing that the Contractor
> provide and maintain financial protection of such a type and in such amount as the
> Commission shall determine to be appropriate to cover public liability arising out
> of or in connection with the contractual activity, provided that the costs of such
> financial protection will be allowable to the Contractor by the Commission.

*Id.* at 2.

65.     Under the Contract Indemnification Clause, the United States has two options for

responding when notified of a public liability action against Mallinckrodt or other persons

indemnified.  First, the United States may assume the defense of the action at its own expense:

> [T]he Commission shall have the right to . . . appear through the Attorney General
> on behalf of the Contractor or other person indemnified in any action brought upon
> any claim that the Commission may be required to indemnify hereunder, take
> charge of such action, and settle or defend any such action.  If the settlement or
> defense of any such action or claim is undertaken by the Commission, the
> Contractor shall furnish all reasonable assistance in effecting a settlement or
> asserting a defense.

*Id.* at 3–4.

13

66.     Alternatively, the United States may allow Mallinckrodt and other persons indemnified to defend the action at private expense, subject to fulfilling the United States's indemnification obligations:

> [T]he Commission shall have the right to, and shall, collaborate with the Contractor and any other persons indemnified in the settlement or defense of any claim and shall have the right . . . to require the prior approval of the Commission for the payment of any claim that the Commission may be required to indemnify hereunder.

*Id.*

67.     The United States' obligations under the Contract Indemnification Clause are enforceable even if Mallinckrodt failed to meet the Contract's requirements: "The obligations of the Commission under this article shall not be affected by any failure on the part of the Contractor to fulfill any of its obligations under this contract . . . ." *Id.* at 4.

68.     The United States' obligations under the Contract Indemnification Clause also are "unaffected by the death, disability, or termination of existence of the Contractor or by the completion, termination or expiration of this contract." *Id.*

69.     Congress abolished the AEC in 1974 and transferred the AEC's research and development functions to the Energy Research Development Administration ("ERDA"). In 1977, the ERDA became part of the Department of Energy ("DOE"), which assumed the AEC's obligations under the Price-Anderson Act and the Contract.

70.     Cotter has given notice of indemnification and defense under the Price-Anderson Act and the Contract.

71.     Under the Price-Anderson Act and the Contract, the substantive rules for contribution, indemnification, and decision in this action are derived from the laws of the State of Missouri, *see, e.g.*, Missouri Revised Statutes § 537.060, which is the State where the alleged

nuclear incident occurred, unless such law is inconsistent with the provisions of the Price-Anderson Act.  42 U.S.C. § 2014(hh).

## COUNT 1
## THIRD-PARTY DEFENDANT MALLINCKRODT

72.     Cotter brings this claim against Mallinckrodt and adopts by reference the allegations in Paragraphs 1 through 71.

73.     Cotter denies fault for Plaintiffs' alleged damages and preserves all affirmative and other defenses.

74.     In the unlikely event that Cotter is found liable for Plaintiffs' alleged damages, which Cotter denies, Mallinckrodt is an alleged joint tortfeasor who is liable, in whole or in part, for Plaintiffs' alleged damages, and Cotter is entitled to contribution (or to the extent available, indemnification) from Mallinckrodt for any alleged damages that may be assessed against Cotter.

75.     In the unlikely event that any damages are assessed against Cotter, which Cotter denies, any such damages were caused, in whole or in part, by Mallinckrodt, thereby barring any such recovery against Cotter.

76.     In the unlikely event that any fault is assessed against Cotter, which Cotter denies, any such fault must be compared to the fault of Mallinckrodt, and any such liability must be limited to the percentage of fault apportioned to Cotter.

77.     Accordingly, Cotter should be awarded any such damages and/or other relief against Mallinckrodt consistent with the Price-Anderson Act, the Contract, and if applicable, Missouri law.

## COUNT 2
## THIRD-PARTY DEFENDANT EVERZINC

78.     Cotter brings this claim against EverZinc and adopts by reference the allegations in Paragraphs 1 through 71.

79.     Cotter denies fault for Plaintiffs' alleged damages and preserves all affirmative and other defenses.

80.     In the unlikely event that Cotter is found liable for Plaintiffs' alleged damages, which Cotter denies, EverZinc is an alleged joint tortfeasor who is liable, in whole or in part, for Plaintiffs' alleged damages, and Cotter is entitled to contribution (or to the extent available, indemnification) from EverZinc for any alleged damages that may be assessed against Cotter.

81.     In the unlikely event that any damages are assessed against Cotter, which Cotter denies, any such damages were caused, in whole or in part, by EverZinc, thereby barring any such recovery against Cotter.

82.     In the unlikely event that any fault is assessed against Cotter, which Cotter denies, any such fault must be compared to the fault of EverZinc, and any such liability must be limited to the percentage of fault apportioned to Cotter.

83.     Accordingly, Cotter should be awarded any such damages and/or other relief against EverZinc consistent with the Price-Anderson Act, the Contract, and if applicable, Missouri law.

## COUNT 3
## THIRD-PARTY DEFENDANT CITI

84.     Cotter brings this claim against Citi, adopts by reference the allegations in Paragraphs 1 through 71, and limits its allegations against Citi for the period prior to the Closing Date of December 29, 1969.

85.     Cotter denies fault for Plaintiffs' alleged damages and preserves all affirmative and other defenses.

86.     In the unlikely event that Cotter is found liable for Plaintiffs' alleged damages, which Cotter denies, Citi is an alleged joint tortfeasor who is liable, in whole or in part, for

Plaintiffs' alleged damages, and Cotter is entitled to contribution (or to the extent available, indemnification) for any alleged damages that may be assessed against Cotter.

87.     In the unlikely event that any damages are assessed against Cotter, which Cotter denies, any such damages were caused, in whole or in part, by Citi, thereby barring any such recovery against Cotter.

88.     In the unlikely event that any fault is assessed against Cotter, which Cotter denies, any such fault must be compared to the fault of Citi, and any such liability must be limited to the percentage of fault apportioned to Cotter.

89.     Accordingly, Cotter should be awarded any such damages and/or other relief against Citi consistent with the Price-Anderson Act, the Contract, and if applicable, Missouri law.

## COUNT 4
## CROSS-CLAIM DEFENDANT DJR

90.     Cotter brings this claim against DJR and adopts by reference the allegations in Paragraphs 1 through 71.

91.     Cotter denies fault for Plaintiffs' alleged damages and preserves all affirmative and other defenses.

92.     In the unlikely event that Cotter is found liable for Plaintiffs' alleged damages, which Cotter denies, DJR is an alleged joint tortfeasor who is liable, in whole or in part, for Plaintiffs' alleged damages, and Cotter is entitled to contribution (or to the extent available, indemnification) from DJR for any alleged damages that may be assessed against Cotter.

93.     In the unlikely event that any damages are assessed against Cotter, which Cotter denies, any such damages were caused, in whole or in part, by DJR, thereby barring any such recovery against Cotter.

94.     In the unlikely event that any fault is assessed against Cotter, which Cotter denies, any such fault must be compared to the fault of DJR, and any such liability must be limited to the percentage of fault apportioned to Cotter.

95.     Accordingly, Cotter should be awarded any such damages and/or other relief against DJR consistent with the Price-Anderson Act, the Contract, and if applicable, Missouri law.

## <u>COUNT 5</u>
## <u>CROSS-CLAIM DEFENDANT CITY OF ST. LOUIS</u>

96.     Cotter brings this claim against the City of St. Louis and adopts by reference the allegations in Paragraphs 1 through 71.

97.     Cotter denies fault for Plaintiffs' alleged damages and preserves all affirmative and other defenses.

98.     In the unlikely event that Cotter is found liable for Plaintiffs' alleged damages, which Cotter denies, the City of St. Louis is an alleged joint tortfeasor who is liable, in whole or in part, for Plaintiffs' alleged damages, and Cotter is entitled to contribution (or to the extent available, indemnification) from the City of St. Louis for any alleged damages that may be assessed against Cotter.

99.     In the unlikely event that any damages are assessed against Cotter, which Cotter denies, any such damages were caused, in whole or in part, by the City of St. Louis, thereby barring any such recovery against Cotter.

100.     In the unlikely event that any fault is assessed against Cotter, which Cotter denies, any such fault must be compared to the fault of the City of St. Louis, and any such liability must be limited to the percentage of fault apportioned to Cotter.

101.    Accordingly, Cotter should be awarded any such damages and/or other relief against the City of St. Louis consistent with the Price-Anderson Act, the Contract, and if applicable, Missouri law.

### PRAYER FOR RELIEF

**WHEREFORE**, Cotter Corporation (N.S.L.) requests judgment in its favor on its Third-Party Complaint against Mallinckrodt LLC, EverZinc USA Inc., and Citicorp Del-Lease, Inc., and Crossclaims against DJR Holdings, Inc. and City of St. Louis, an award of court costs and fees, and any further relief as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Cotter Corporation (N.S.L.) demands a trial by jury of all issues so triable by right.

Dated: September 29, 2023      Respectfully submitted,

*/s/ Brian O. Watson*
Brian O. Watson, #68678MO
Lauren E. Jaffe, #6316795IL
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison St., Ste. 2900
Chicago, Illinois 60602
(312) 471-8700 (main)
(312) 471-8701 (fax)
bwatson@rshc-law.com
ljaffe@rshc-law.com
docketdept@rshc-law.com

Jennifer Steeve, #308082CA
E. Ashley Paynter, #333428CA
RILEY SAFER HOLMES & CANCILA LLP
100 Spectrum Center Drive, Suite 440
Irvine, CA 92618
Phone: (949) 359-5515
Fax: (312) 471-8701
jsteeve@rshc-law.com
apaynter@rshc-law.com
docketdept@rshc-law.com

**ATTORNEYS FOR COTTER CORPORATION (N.S.L.)**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 29, 2023, these papers were filed through the CM/ECF

system, which will automatically serve an electronic copy upon all counsel of record.

Respectfully submitted,

*/s/ Brian O. Watson*
Brian O. Watson, #68678MO

4856-9342-2208, v. 7

21